VALENTINE v. MINNEAPOLIS, ST. PAUL & SAULT STE. MARIE RAILWAY CO.

1. RAILROADS—FIRES—NEGLIGENCE.

In an action on the case charging that, after fire had been communicated to forest products, piled along defendant's right of way, and to certain cars standing on adjoining side tracks, and after plaintiff had separated his products and made an opening between the part burning and the part not burning, the defendant carelessly and negligently caused the burning cars to be moved and left adjacent to plaintiff's products which had been separated, evidence examined, and *held*, to have been properly submitted to the jury.

2. SAME—NEGLIGENCE—RESPONSIBILITY.

Where defendant's switching crew had been sent to the scene of a fire and co-operated with others in saving property from destruction, it cannot be said, as a matter of law, in the absence of a showing as to what the orders were, that they were not acting under the authority of defendant.

3. APPEAL AND ERROR—CHARGE TO JURY—MATERIALITY.

Where defendant's witness had testified that plaintiff protested against the moving of a burning car into a position adjacent to property he was trying to save, defendant could not object to the charge on that ground. And, if the other facts were established, it was immaterial whether plaintiff protested or not.

4. SAME.

Error cannot be assigned upon a charge to the jury when it is in favor of the appellant, and based upon the testimony of its own witness.

Error to Schoolcraft; Steere, J. Submitted October 13, 1908. (Docket No. 45.) Decided December 21, 1908.

Case by John M. Valentine against the Minneapolis, St. Paul & Sault Ste. Marie Railway Company for the negligent burning of certain timber. There was judgment for plaintiff, and defendant brings error. Affirmed.

The following is the plat referred to in the opinion:

*C. W. Dunton* (*Alfred H. Bright* and *E. C. Chapin*, of counsel), for appellant.

*Virgil I. Hixson*, for appellee.

BLAIR, J.  The plaintiff in this action seeks to recover from the defendant the value of certain forest products alleged to have been consumed by fire on May 22, 1905, by and through the negligence and carelessness of the defendant.  The main track of defendant's railroad, running from Minneapolis to Sault Ste. Marie, crosses the lower part of the Upper Peninsula in an easterly and westerly direction.  The private logging railroad of the Thompson Lumber Company crosses defendant's track in Schoolcraft county, running in a northerly and southerly

direction, from Thompson on Lake Michigan northerly into the timber about 25 miles. The plaintiff's declaration contains practically two counts:

(1) That the defendant carelessly and negligently permitted fire to escape from its engine and to be communicated to said forest products.

(2) That after fire had been communicated to said products and to freight cars standing on a side track adjacent to said forest products, and after plaintiff had separated his products and made an opening between a part then burning and a part of the same not burning, the defendant carelessly and negligently caused burning cars to be hauled out of the fire and left adjacent to a part of said forest products which had been separated, causing the fire to communicate thereto and consume the same.

The map printed herewith shows the situation in question, and the distances material to the inquiry. It was proven upon the trial that the fire started from an engine of the Thompson Lumber Company on the Thompson line, and plaintiff thereupon abandoned the first count in his declaration above mentioned, and recovery was had upon the second count. Motion for a new trial was entered by the defendant, and the same was refused, the reasons given for such refusal, exceptions taken, and error assigned thereon. Defendant brings error.

It is the claim of the defendant:

(1) That no actionable negligence was shown on the part of the defendant.

(2) That the acts of the defendant in removing said cars were entirely compatible with the degree of care required by the law under the circumstances.

(3) That it was conclusively established on the trial that the property in question was doomed by fire, and would have been consumed, regardless of the action of the defendant in moving the cars.

(4) That the court in charging the jury erred in assuming, contrary to the plaintiff's own testimony, that the moving of the burning car was against the protest of plaintiff.

(5) That the court erred in charging the jury and submitting to them, as a question of fact, whether the burn-

ing car was kicked back at the request of the plaintiff to a point designated by him.

(6) The court erred in refusing to grant a new trial for each of the errors above mentioned and in the reasons assigned by him for so doing.

(7) The court erred in refusing defendant's motion for a new trial and holding that the verdict was not against the clear and manifest weight of the evidence upon the proposition that the forest products were doomed to destruction by fire before the moving of the cars.

The third point raises the principal question in the case. The evidence not only supports the plaintiff's second count, but, in our opinion, the great weight thereof convicted defendant's switching crew of negligence, and the question for our determination is, assuming defendant's responsibility for the negligence of the switching crew, Does the record conclusively prove that the destruction of the timber was inevitable, regardless of its negligence?

The testimony is in conflict on most of the material facts. There was evidence tending to show that the plaintiff's forest products were piled, upon bark theretofore peeled, along the westerly or southwesterly side of the Y, and, adjoining his timber on the east, was the timber of others; that the timber which plaintiff was endeavoring to save was west of the middle point of the Y and of a certain box car standing thereon. Cedar was also piled on the easterly or northeasterly side of the Y, but the testimony tended to show that it did not extend beyond the opening made by plaintiff towards the west end of the Y or farther west than the box car. The defendant's witness Tebo, among others, testified:

"The cedar was piled a distance of about 200 feet along the inside of the Y. It was piled pretty well towards the east end of the Y on the inside, and extended from the derailer on the east end about 200 feet westward, or something like that, probably about 150 feet from the derailer of the Thompson line."

Defendant's witness Claude Rivers testified:

"I was inside of the Y track. I was not on the out-

side of the Y track at all. I don't know how the fire was burning in the cedar on that side. When I got there, it was all burned over on the inside of the Y. There was still some fire burning in some stumps and smouldering along the track where the cedar had been burned. That was along by the box car, and to the south of the box car. The timber on the inside only came up to the box car to the westward."

Its witness Ellis testified:

"About three weeks before this there was a fire at the junction, and Mr. Valentine and I put it out. That fire was burning near the center of the triangle. * * * It did not burn up the timber, but burned to the timber, so the westerly end of that triangle had been burned off some weeks before."

The switching crew of the locomotive of the Thompson Company which set the fire gave testimony, on defendant's behalf, tending to show that the fire was set at about half-past 12 that day, at a point marked " T " on the map, five or six rods southwest of the junction of the two railroads:

"The wind was from the northeast. The wind was blowing at a pretty good breeze, and it didn't take long to get into the cedar on the inside of the Y. That practically all burned up the first thing. Then the first thing we did, there were 15 or 16 cars on that leg of the Y, and we pulled out 12 box cars out of the west leg of the Y. There were 15 or 16 cars on the west leg of the Y, and we pulled out 12 box cars, and left three or four there. * * * The fire was so intense in the cedar to the east of the gap between the cars that we couldn't get in there to couple on to those cars further west."

The testimony as to the location of the box car from which the fire was communicated to plaintiff's timber and the point where the opening was made by him was in sharp conflict. Plaintiff testified:

" I got some men to help me make an opening in the cedar. We made this opening a little more than half way to the switch towards the Soo track. This we did to prevent that part of the cedar from burning.

That is, that part towards the Soo track. It was at a place where there was only one course, and we took posts out of there and opened it up so it would be clear space, so that when it burned up to that point it wouldn't burn any further. The wind at this time was in a northwesterly or westerly direction. It was blowing from Delta Junction towards the switch. It was very near along with the Thompson track. There were some cars on the west switch track. I noticed one a little more than half way, not quite half way, up the switch track from the Thompson track. It was loaded with spruce or balsam or hemlock. It was something over 300 feet on the switch from the Soo line end. This car was burning. We made the opening to the westward of this car; that is, between the car and the Soo line end of the switch. We made the opening as close to the car as we could stand it for the heat. * * * We were getting the cedar out of the way, and putting sand on there so as to stop it. * * * I don't know how long we were engaged in making the opening and throwing up the sand, probably an hour or an hour and a half—it might have been two hours—I cannot tell how long it was. * * * While we were working to make this opening, getting this space opened as we thought to stop the fire, the switch engine backed in on the spur from the Soo line track, and coupled on to the car which was on fire, and drew it up abreast of the cedar, which we had separated from the burning cedar and left it there. When they left the car there, the wind blowing in the direction towards the cedar communicated the fire to the grass and to the cedar, and we had to get out of the way. The cedar was about 15 or 20 feet from the track. Between the spur track and the cedar was dry grass. This car when left was left about 120 feet from the Soo line end of the switch. It had been moved about 190 feet. *I went up there the next day and measured the distances.* The car that was moved up to within 120 feet of the Soo line end of the switch was burned. After they moved the car up there opposite the cedar we had to quit. It got too hot; everything burned and we had to get out of there. I was unable after that to do anything towards saving my cedar, except there was a small lot of poles that lay separate towards the Soo line track, and we threw some dirt around them so as to save a small amount of them. * * * The box car was easterly about 85 feet from where I made the opening in the cedar."

Other witnesses for plaintiff testified:

"Before they coupled on to these two cars, the cars stood even where we were parting the cedar. These two cedar cars were not afire. I noticed a box car on the switch. We had pushed it out into the fire. It was then all afire. It was loaded with pulp wood. * * * It was some time after 12 o'clock when I got there. I don't know positively what time it was. Dufour, Valentine, and his son were there at that time. Valentine was at work at his cedar, and Dufour was over at his own cedar trying to save it. The box car was then about halfway up the switch track. * * * At the time we were working there, there was no fire to the westward of us. It was all on the east side. While I was there the Soo line switch engine moved in from the Soo track on the west leg of the Y, and backed down in there, and pulled the car up, I should judge, about four or five car lengths up in front of this pile we had divided, and uncoupled from it and left. It was on fire when the engine coupled on to it. It was blazing quite hard when they uncoupled it, so hard that nobody could do anything with it. This car was drawn up there, and the cedar to the west of us burned. We had to quit, and couldn't do anything more. We even lost our shovels. * * * There was nothing to communicate the fire from the burning cedar to the unburned cedar before the car was moved. After the car was moved it would set the whole thing afire. * * * When Mr. Valentine and I reached there the box car was down on the Y about eight rods from the Delta switch. * * * When I speak of the Delta track, I mean the Thompson track. Its old name was Delta. * * * We divided the pile about half way between the two switches, I should judge. * * * The fire was below towards the Thompson line. I do not know of any fire towards the Soo line from where we divided the posts. I noticed a flat car and a box car on the Y. The box car was towards the Thompson track from where we were working. I don't remember whether the car was on fire or not, when I got there. After I had been there probably an hour the switch engine came in on the Y. I was helping Mr. Valentine at the place I have described, making the opening. The Soo line engine came down the Y from the west end and pulled those cars up there, cut loose from the box car and left it stand there right

about opposite where we were working. The box car was burning rapidly when it was pulled up there. We stopped work, and left when they dropped the car there. It was no use to work longer. We were dividing the pile, throwing the posts around."

The testimony tended to show that the poles that were saved by plaintiff's efforts were a few feet west of his forest products which were burned. The defendant's switch engine reached the fire at 2:15 or 2:20 p. m., and at that time the timber piled on the inside of the switch was practically burned up, but "there was no fire on the outside of the Y, where we were, right about where the box car was."

Defendant does not allege or contend that it was necessary to destroy the plaintiff's property in order to save its own. It stands upon the proposition that his timber was doomed to destruction before it moved the burning car. It is evident that the plaintiff hoped to save a portion of his timber, and that he and his assistants, who were cognizant of all the conditions, believed that such hope was not a forlorn one. They had not finished their efforts to protect the timber when the switching crew moved the burning car, but were in the midst of such efforts. They were widening the gap and throwing sand upon inflammable materials when the moving of the car forced them to abandon their efforts. Although the fire was raging fiercely to the east of the gap, the western end of the triangle had burned over three weeks before, and there was no imminent danger to windward of the separated timber. The wind, blowing parallel with the Thompson line track, was not blowing towards plaintiff's timber, but practically away from it, and the danger was from the fire backing up through the line of timber. The fire had been burning at the east end for nearly two hours, and still had not advanced near enough to the gap to prevent plaintiff and his assistants working there. Even though the plaintiff's chance to save his timber was, as alleged by defendant's counsel, merely "a gambler's chance," he had a right to

take it, and the defendant had no right to destroy such chance and render certain the destruction of his timber. Furthermore, after being driven from his work, the plaintiff still persisted in his efforts to, and actually did, save a portion of his timber only separated a few feet from the line of burning timber. Where a certain result is alleged to be a necessary sequence of the operation of natural laws, a correct judgment must usually depend upon an exact knowledge of so many determining factors that such determination must generally be for the jury. Certainly, where a party, without legal excuse, has anticipated the operation of natural laws, and forestalled the doom alleged to be impending, the burden must rest upon him to show, by clear, undisputed, and conclusive evidence, the existence of every fact essential to the validity of his proposition. *Thoburn* v. *Campbell*, 80 Iowa, 338; *Harrison* v. *Wisdom*, 7 Heisk. (Tenn.) 99. We are of the opinion that the circuit judge did not err in submitting this question to the jury, and in declining to set aside their verdict upon the ground that it was against the clear weight of the evidence. We do not intend to intimate, in disposing of this question, that the point would be available under the plea of the general issue, if objection were made upon that ground.

The first and second points may be considered together. The negligence of defendant was properly submitted to the jury, unless, as urged by defendant's counsel upon the oral argument, defendant was not responsible for the acts of its switching crew. Defendant's witness Deemer, who had charge of its switching crew, testified:

"We were at work here, and was informed by a messenger boy of the fire shortly after dinner. We left our work at the shingle mill, went to the depot and got orders to go to Delta Junction. Arriving there we stopped just east of the Diamond. I asked what they wanted us to do. Mr. Cooper, superintendent of the Thompson Lumber Company, was there. He was also manager of the Thompson railroad. I believe it was Cooper to whom I spoke. He said he thought I had better try and save

those three cars on the west leg of the Y. When he told me to do so, I went in on the Y, coupled on to them, and started to pull them out, and there was a protest set up that I shouldn't pull them out, and I rung the engineer down, and he stopped. Valentine made the protest."

It does not appear specifically what the orders were to the switching crew; and the court cannot say, as a matter of law, that the crew was turned over to the Thompson Lumber Company and subjected to its orders. It is quite as reasonable to infer that the crew was sent to the junction to protect the defendant's property by co-operating with others in such manner as seemed advisable to the crew.

*Fourth.* Defendant's witness Deemer, as above quoted, testified that he moved the car against plaintiff's protest. He further testified:

"When we moved in there, there was no protest against moving the car out. When we started to move it out, there was a protest. *I was standing right along the car at that time.* They said, 'Stop, where are you going with that car?' We stopped. I said, 'What do you want?' They said, 'Kick it back.' We proceeded to do so. I think it was Mr. Valentine who said that. I did not pay much attention to who was there."

The court charged the jury upon this subject, in part:

"If you should find that the crew of the switch engine, against the protest of the plaintiff, did negligently pull and place a burning car directly opposite to his timber on the windward side, in such position that it was evident that the burning car would injure the timber he was trying to save, and drive away those trying to protect it, and if you find from the evidence that the destruction of the timber, which otherwise might and would have been saved, was caused by that act, then the plaintiff is entitled to recover such damages as resulted from that act."

In our opinion, if the jury found the existence of the other facts, it was immaterial whether a protest was made or not, and, in view of Deemer's testimony, the objection was not open to defendant.

*Fifth.* The charge, in the respect complained of, was in favor of the defendant and based upon the testimony of its witness Deemer.

We are of the opinion that no errors were committed by the trial judge, and the judgment is affirmed.

GRANT, C. J., and HOOKER, MOORE, and McALVAY, JJ., concurred.