MONROE, J.
Defendant prays for the review of a judgment rendered by the Court of Appeal, Second circuit, condemning it to pay plaintiff $422, with interest from judicial demand, as the value of certain staves belonging to him which were set on fire by two cars of burning cotton moved near them in order to get the ears away from, and prevent their setting fire to, more valuable property belonging to the defendant, or for which it may have been responsible. Plaintiff alleges that the setting fire to the cotton was—
“the direct result of the carelessness of the employés of said company and the defective *275 construction of the grate, fire box, smoke stack, and other parts of the engine used at that time in transporting freight; that, owing to said defective construction and carelessness, sparks were allowed to escape, and fire was left in such position as to ignite certain bales of cotton left on open cars on the track, and said cars of cotton, being near the depot and other valuable property of said company, were removed to a point so near to petitioner’s piles of staves as to set fire and destroy all of them except parts of the red oak staves which were taken by the employés of said company and sold for its account and benefit.”
The case presented by the evidence is as follows: At the little village of Wisner, in the xsarish of Franklin, defendant’s main track runs north and south; upon the east side of it stands the depot; to the northward of the depot, 25 or 30 feet distant, is an open platform upon which, on the night of the fire, there were a number of bales of cotton awaiting shipment; to the eastward of the depot, within 10 or 12 feet, there is a siding or “house track” which connects with the main track to the northward of the cotton platform and to the southward of the depot, the distance at the depot between it and the main track being 50 feet; the two cars that were burned were box cars which had been loaded and sealed during the day preceding the night of the fire and left standing on the house track alongside the depot; on the same track, about 100 feet below the depot, there was a seed house, and plaintiffs’ staves, as also a lot of staves belonging to Mr. Humble, were piled on the right of way between the depot and the seed house, about 8 feet from the track — the staves belonging to Mr. Humble constituting the north end of the pile. In the early part of the night a local train with a partly disabled engine, after switching some cars on the house track, including, probably, those containing the cotton, had left the station, and at 8:20 o’clock a freight train had arrived which departed about 9 o’clock; about midnight Mr. J. Johnson, living some 300 yards down the track, saw the light or blaze of the fire, and immediately proceeded to the scene, followed by his son, B. F. Johnson, and they at once aroused Mr. Rhodes, the agent, whose testimony as to the condition existing during the day and night prior to that time is, in substance, as follows, to wit: There were 30 or possibly 35 bales of cotton on the platform; he was at the station when the local train went down; they made one switch on the house track; he does not know whether they moved the cotton cars or whether the cars were moved by the men who loaded them, but they had been moved about a car length (meaning from where they stood before they were loaded); the cars were loaded in the forenoon or early part of the afternoon, and the doors were closed and sealed as soon as they wiere loaded, say about 3 o’clock in the afternoon; they were offered to the local train, but, on account of disabled engine, they could not handle them; thinks it more probable that a spark from a locomotive would have ignited the cotton on the open platform than that in the closed box car; was asked, “Do you think, Mr. Rhodes, that it is more likely the cotton was on fire when loaded in the car,” and replied, “Well, I understand cotton will smolder a long time, but I have no idea as to how the cotton caught on fire.”
He says further:
“When I got there Mr. Johnson and bis son were there, and I saw that, unless something was done immediately, the depot would burn. I went to the toolhouse and got some pinch bars to shove the cars with, and, when we got back up there, both ends of the cars were burning considerably. I suppose from 2 to 4 feet down on the cars from the tops; we shoved the ears from 20 to 25 feet south. * * * Q. Would Mr. Latta’s staves have burned if the cars had not been moved? A. I believe the north end of the staves would have been burned. I don’t know just how many. * * * Q. Mr. Rhodes, do you know whether or not all those staves belonged to Mr. Latta? A. *277 I think part of them belonged to Mr. Humble; he had part of the staves placed on the right of way. Q. Do you know whether the staves nearest the cars when they first caught fire belonged to Mr. Latta or Mr. Humble? A. Mr. Humble, I think. Q. Then, if the cars had not been moved, do you think Mr. Latta’s staves would have been burned? A. I think the north end of the staves would have burned. Q. Where were they when the cars first caught? A. The south end of the cars passed below the north end of the staves, say 10 feet. Q. Then, by removing a few staves, you might have saved them? A. I don’t know; you might have done so.”
Mr. J. Johnson testifies that the cars were pushed down the track, near plaintiff’s staves, “to save the depot and cotton on the platform,” by probably 7 or 8 persons, of whom all save the agent and the track foreman were citizens not employed by the defendant. He further says that “some” of the staves would have been burned if the cars had not been moved. B. F. Johnson’s testimony is much to the same effect; he also, making the distinction between all of the staves and a portion of the staves by saying that “somebody’s” staves would have been burned whether the cars were moved or not. He further testifies as follows:
“Q. When you got there, were the flames coming out? A. Yes, sir; the flames were coming out of one of them. * * * Q. Where were the flames coming- out of the car; what part of it? A. Between the door and one end of the car; on the top and on part of the side.”
Mr. Gilbert reached the scene in time to assist in moving the cars, and he says that, when the cars had about cleared the depot, he blocked their further progress with a stave in order to protect his seed house in which he had a great deal of freight. He further says:
“Mr. Rhodes was * * * doing all he could, of course, to save the depot and the cotton on the platform, and I do not suppose that he saw that he was pushing the cars into the seed house. * * * Mr. Rhodes was there working manfully to save the depot, and I suppose it was through his efforts that it was saved.”
Mr. Latta arrived after the ears had been moved and had burned through and the roof or roofs had fallen. He testifies further (in part) as follows:
“I have been shipping staves on this road for a long time. I placed these staves there for shipment as soon as I could get a car, * * * and on the day of the night that the staves were burned I had (had) placed there for loading, or rather had asked for, a car, which was placed on the south end of the passing track, but the conductor was unable to place the car where I could load it on account of some cars which were being loaded with cotton. * * * Q. Did you have permission from the company to place these staves there? A. I did; X had permission from the agent. * * * Q. Had it been customary to place staves on the right of way of this road up to that time? A. Yes. * * * Q. If the cars had been allowed to remain where they were when they caught fire or when the fire was discovered, would your staves have been destroyed? A. No, sir; or, in other words, I could have saved them. * * * We did everything we could to save the depot and the other cotton on the platform, I don’t know how many bales, but there were a number of bales on the platform; we did all we could to save it and the depot. * * * I heard a train after I came home, about 9 o’clock. * * * I suppose it was a freight, I did not see it. * * * We could not have saved the depot (if the cars had not been moved), and of course if the depot had caught fire I don’t believe we could have saved the cotton on the platform. * * * The north end of the north car (after they were pushed down) was about two feet south of the south end of the depot. Q. Don’t you think they exercised good judgment in pushing the cars away from the depot? A. No doubt they did. * * * ”
It is not shown at what hour the local train did the switching on the house track and went down the road, nor is it shown that the engine of the freight train emitted sparks. It is shown that the citizens united with the agent and section foreman in their efforts to save the depot and the cotton on the platform. It is not shown that there was freight of any value in the depot, nor is there any evidence as to the value of the depot building or the cotton on the platform. Plaintiff has testified to the value and number of his staves.
*279 Opinion.
[1] The learned judge of the district court says in the written opinion filed by him:
“There is nothing in the evidence to show how the fire originated or from what source it was communicated to the two cars of cotton. * * * The fact that defendant’s agent and other employés were engaged in moving the burning cars X do not think would render the company liable for plaintiff’s loss any more than it would make liable the other parties engaged in moving said cars.”
Pending the appeal, the author of the opinion thus quoted became a member of the Court of Appeal, and upon his recusation, the remaining members of the bench— Judges Porter and Drew — finding themselves unable to agree, Judge Gunby was called in and concurred with Judge Drew in reversing the judgment appealed from; Judge Porter dissenting.
The opinion of the court holds that, whilst it is “more than probable” that the cotton that was burned was ignited by sparks from the train, the evidence is not strong enough to justify a finding to that effect, and the judgment for plaintiff is based on the proposition that defendant had no right to sacrifice plaintiff’s property in order to save its own. Our consideration of the evidence (which, having been taken by consent and reduced to writing, is presented to us as it was to the other courts) has led us to a different conclusion from that reached by our learned Brethren upon the question of the origin of the fire, though we are entirely in accord with the Court of Appeal in the conclusion last above stated.
The evidence is direct to the effect that the fire came out of the cars. B. P. Johnson, who with his father was the first to arrive upon the scene, so testifies, and the faet seems to have been generally accepted. Two witnesses, Rhodes and Gilbert, testify that they never knew of a box car being set on fire from the outside by sparks — Rhodes being a railroad man, and Gilbert being a shipper living within 200 yards of defendant’s road — and, upon its face, it seems improbable that there should have been sparks which would ignite a fire upon the outer surface of a car and yet leave unharmed a lot of cotton in bales upon an open platform. There is nothing in the record from which it could be assumed that the cars were tampered with after they were sealed, or that the cotton, which had been sealed up in them, was thereafter accessible. If they had been tampered with, the two John-sons and Rhodes were there in time to have noticed it, and could hardly have failed to have done so. Mr. Rhodes, when asked whether he thought it more likely that the cotton was on fire when loaded in the car (than that it should have been ignited by a spark, after having been loaded) answered, “Well, I understand cotton will smolder a long time, but I have no idea how the cotton caught on fire,” from which it is evident that he did not know, and was not prepared to say, that the fire had not got in the car or cars in the manner indicated by the question; and it is also evident that he was of opinion that the time which had elapsed between the sealing of the cars and the breaking out of the fire did not, of necessity, militate against the soundness of that theory. And we know, as a matter of common knowledge, that it does not, since fires, smoldering for days in the holds of cotton-laden ships, are not infrequent occurrences. Whether the spark that ignited the cotton came from a pipe, cigar, cigarette, locomotive, or other source would, of course, be a matter of pure conjecture, but, if we are correct in concluding that it did its work before the cotton was sealed up in the ears, it is also immaterial; the important fact being that the fire, let its source have been what .it may, was put into the cars with the cotton.
[2] If, however, we should be in error as to the manner in which the fire got into the *281 cars, we are nevertheless of opinion that plaintiff is entitled to recover upon the grounds that defendant had no right, legal or moral, to destroy his property in order to save its own; that it was at the behest and in the interest of defendant, acting through its agent, that the burning cars were moved down upon plaintiff’s staves, to which they set fire; and that the bringing of the cars in juxtaposition with the staves was the proximate, and not the remote, cause of the destruction of the staves. Defendant, in effect, invokes the rule of the common law, that, with respect to private rights, necessity privileges a person acting under its influence (necessitas indueit privilegium jura privata), according to which it is said that, if two men be on one plank insufficient to save both, and one be thrust off and drowned, the homicide is excusable; that the taking of food to satisfy urgent hunger isjiot a crime; that for a prisoner to leave a burning jail is not a breaking of jail; that the tearing down of a house to prevent the spread of a conflagration is damnum absque injuria; that one who finds his neighbor’s dog in his park, pursuing his deer, or his neighbor’s poultry within his grounds, may kill them, etc.; and, applying the rule to this case, the learned counsel for defendant argue that the burning cars (for the existence and condition of which they say that defendant was in no wise responsible), by threatening the destruction of its property, created so urgent a necessity that their removal became merely incidental to a controlling agency which was, and continued to be, the proximate cause of all the effects which resulted. In support of their position they cite the case of Ætna Ins. Co. v. Boon, 95 U. S. 117, 24 L. Ed. 395 (Law, 395), from the syllabus of which we make the following excerpt:
“Where a policy of fire insurance excepts liability for a fire which may happen by means of an invasion or of any military or usurped power, a fire which happened by means of the burning of properly by a United States military commander, in order to prevent military stores from falling into the possession of the rebel forces, was excepted from the risk undertaken by the insurers. The proximate cause is the efficient cause; the one that necessarily sets the other causes in operation.”
[3] It does not follow, however, because defendant in this case had, upon its premises and under its control, combustible material in which a fire originated, thereby threatening the destruction of its property, that it must “necessarily” have so disposed of the burning mass as to destroy the property of the plaintiff, which property, but for such action, would have been left unharmed, and more particularly is that true since the property destroyed was placed where it was for shipment, upon the invitation of defendant as a common carrier, and would not otherwise have been placed there, and defendant was therefore especially bound for its safety as against any acts of its own. We are also referred to the case of Owen v. Cook, 9 N. D. 134, 81 N. W. 285, 47 L. R. A. 646, in which it appears that a party out camp hunting, environed by a prairie covered with dry grass, were threatened with a fire, which, driven by a high wind, was approaching from the north, whilst away, some two or three miles to the south, plaintiff’s decedent owned some property; that the campers “back-fired” in order to protect themselves and their belongings; but that the original, and not the back fire, was the fire that destroyed the property of the plaintiff. In the course of the opinion it was said:
“It is shown that, at the time the back fire was set on the south side of the house, the original fire had gone two or three miles to the south and was burning westward all along the line. Under such conditions, the defendants had a right to believe that this back fire, which they carried a few rods to the west in advance of the main fire, would join and burn out in the main fire, and that is just what did occur, as the evidence shows that the back fires united with' the main fire within 60 rods of the house. * * * It is not negligence to start a *283 back fire to protect one’s property, providing the care and diligence of an honest and prudent man are exercised in guarding it. * * * In the case at bar it must be conceded that the property of plaintiff’s intestate would have been destroyed by the main fire had no back fire been set by the defendants.”
Further along in the opinion the court gives the following excerpt from Bishop, Non-Oont. Law, paragraph 45, referring to the leading and approved ease of Scott v. Sheppard, 2 W. Bl. 892, 3 Wils. 403:
“The defendant threw a squib into an open market house where there were many people. It fell upon the standing of Yates, and another there, instantly to prevent injury to himself and Yates, threw it across the market house, and it fell upon the standing of Ryan, who instantly for the same reason as before sent it to another part of the market house, and it there took effect upon the plaintiff. The intermediate throwings, it is perceived, were from an impulse, natural and to be expected, so that the disastrous result, though ‘remote,’ was deemed a product of the original cause.”
In the case now under consideration, we think it conclusively shown that the original fire would not have destroyed plaintiff’s property, and, though the impulse which led to the removal of the burning ears from the place where they threatened the property of defendant to that where they destroyed the property of plaintiff, may be regarded as natural in some sense, it was hardly that kind of a natural impulse which impels one to brush a wasp from one’s face or to get rid of a dangerous squib; it belongs rather to that class of sordid impulses which may and should be restrained.
In the case of Valentine v. Minneapolis, St. P. & S. M. Ry. Co., 155 Mich. 151, 118 N. W. 970, the defendant railroad company was charged with having originated a fire and having then, as in this case, moved some burning cars into such a position as to set fire to and destroy timber belonging to plaintiff. It was not pretended that the movement of the cars was necessary in order to save any property belonging to defendant, and the court did not therefore have to decide, and does not appear to have decided whether defendant could have sacrificed plaintiff’s property in order to save its own, although an inference to the contrary might be drawn from the syllabus. What we do find in the opinion as pertinent to the main issue decided is the following (among other things):
“Even though plaintiff’s chance to save his timber was, as alleged by defendant’s counsel, “a gambler’s chance,” he had a right to take it, and the defendant had no right to destroy such chance and render certain the destruction of the timber.”
The case of the plaintiff before this court is stronger, since he testifies that, but for the moving of the cars, he could have saved his staves, and he is not contradicted but is corroborated in that statement.
[4, 6] The argument of the learned counsel that the moving of the fire to the place where it ignited plaintiff’s staves, though without such moving there would or may have been no such ignition, rests partly upon the proposition that defendant was confronted with an emergency, was obliged to act immediately, and should not be held to the responsibility of one who is afforded time for deliberation; and partly upon the idea that, it being a question whether the more valuable property of the defendant or the less valuable property of the plaintiff should be saved, it was excusable or justifiable to save the former at the sacrifice of the latter. It is, however, the party who, through the fault of another, is subjected to sudden peril, who is not expected to exercise deliberate judgment, but, in this ease, even though it should .be conceded that defendant was not culpably at fault with respect to the origin of the fire, it cannot be denied that, the fire having originated in combustibles in its possession and under its control, it was more at fault than plaintiff, and hence that, agreeably to a well-recognized rule, being the least innocent of two *285 innocent sufferers with respect to the cause, it should bear the loss. Upon the other hand, to hold, in general, that the question of the right of one individual to destroy the property of another in order to save his own, where it is impracticable to save all, is to be determined, on comparison of values, in favor of him whose property is the more valuable, would lead to great injustice; and it appears to us that it would be proper to consider, in that connection, the question of the comparative ability of the sufferers to sustain the loss. The property of the plaintiff now before the court, which was destroyed, is shown to have been worth $422, and it may have been all that he owned. The property of the defendant, which is shown to have been saved, is a small wooden station house and a wooden platform, the value of which is not disclosed, to which may be added 30 or 35 bales of cotton said to have belonged to Mr. Gilbert, who assisted in moving the burning cars away from the cotton until they reached plaintiff’s staves, where he blocked their further progress in the direction of the seed house, because the house also belonged to him and he did not care to have it destroyed.
[6] It will be remembered that he said in his testimony, “I do not suppose that he [Rhodes] saw that he was pushing the ear into the seed house.” Judging from the photographs which we find in the record, however, we should not suppose that the seed house was worth more than the staves, and wé find no reason disclosed why, since they were moving the cars, they could not have moved them past the seed house. It is true that defendant’s agent and section foreman, and the five or six citizens who aided them, were inspired, in moving the cars, by the common purpose to save the depot and the cotton on the platform; but it is equally true that the movement was initiated by defendant’s agent, and that the purpose was directed and controlled by him in defendant’s interest, and whilst he was acting within the scope of his employment. We can see no reason, therefore, why defendant, who has reaped the benefit, should not be held liable for the consequences, to plaintiff, of what was thus done. The judgment complained of awards plaintiff interest on the principal amount for which defendant is condemned, from judicial demand, whereas the interest, in such eases, should be allowed only from the date of the judgment. Ortolano v. Morgans R. R., 109 La. 902, 33 South. 914; Eichorn v. New Orleans, etc., Co., 112 La. 249, 36 South. 335, 104 Am. St. Rep. 437.
It is therefore adjudged and decreed that the judgment of the Court of Appeal here made the subject of review be amended in so far as that interest is allowed from the date thereof, instead of from judicial demand, and, as thus amended, affirmed; plaintiff in the suit to pay the cost of this proceeding.