Statement of the Case.
NICHOLLS, O. J.'
The plaintiffs are the father and mother of Rosalino Ortolano, a boy five years of age, who, they alleged, was killed while crossing the -railroad track of the defendant corporation at its intersection with the public road about 300 feet below the bridge leading to and crossing Harvey’s Canal. They prayed for judgment for $45,000 damages against the defendant, alleging that their said child died of injuries received on Easter Sunday, April 7, 1901, by being run down and struck by an engine (with a caboose attached) of the defendant about 4:30 p. m.; that at said time no train was in sight of said child, who was then unconscious of any danger, and unable to protect himself in the premises; that, before he could clear said track entirely, one of the engines of the defendant, with caboose attached, in charge of its employés and agents, for whom it is responsible, came dashing along said track at a very high and unlawful and negligent rate of speed, and ran down and struck said child, and inflicted horrible mutilation and injuries upon him, which caused him unspeakable pain, and brought about his untimely death.
They specially averred that said accident was brought about solely and entirely by the gross negligence, incompetency, and want of skill of those in charge of said train, for which said defendant company was liable; that neither petitioners nor said child in any way contributed to said accident; that said employés in charge of said train had ample time to stop the train, and thus save the life of the child, but that they were not attending to their duties; that they were not at their posts at the time; that they failed to see the child altogether, although he could have been seen in time to prevent the accident; that they failed to give any signals of any kind, and kept on at the furious rate of speed without even stopping the engine after killing the child.
That the actual damages of the child for the awful suffering which was inflicted on it, mentally and physically, the indescribable horror of its condition, the shocking mutilation of its body, the pain and horror consequent to the injuries which the child suffered, which right of actions survived in the petitioners, could fairly be estimated at a sum of not less than $25,000.
That the anxiety, sorrow, and pain, etc., which had been caused to them by the careless and negligent killing of their child could fairly be estimated at a sum not less than $10,000.
That there was due' to them for the loss of the companionship and society and the loss of support from their child a sum which could be fairly estimated at a sum not less than $10,000.
The defendant answered under reservation of an exception of “no cause of action” filed by it, which the court had overruled. It pleaded first the general issue. Further answering, it averred that, “if the son of the plaintiffs, at time and place alleged in their petition, was struck, injured, and killed, by one of its engines (which it denied), it was so struck and injured and killed by and through its own and plaintiffs’ negligence and imprudence, which contributed and was the proximate cause of said injury and killing.”
The case was tried without a jury, and judgment was rendered by the court in favor of the plaintiffs against the defendant for $10,000, with legal interest from judicial demand until paid, and costs.
Defendant appealed.
Opinion.
It is a matter placed beyond dispute that Rosalino Ortolano, a son of the plaintiffs, about five years of age, died on Easter Sunday, April 7, 1902, in Jefferson parish, near Harvey’s Canal, from the effects of wounds inflicted upon him by an engine (with caboose attached) which was in charge of officers and employés of the defendant, then proceeding on its way from Lafayette to New Orleans. The child, from the m'oment it was struck, remained in an almost insensible condition, and died in half an hour or less. The accident occurred at a point of the line of the defendant company’s railroad some 460 feet nearer New Orleans than the east end of the rail *905 road bridge which crosses Harvey’s Canal, aDd at the intersection with the railroad track of a neighborhood private crossing, over which the employés of the Cypress Lumber Company, those of Robert Harvey’s brick manufactory and dairy, and other industrial establishments in the immediate vicinity of Harvey’s Canal pass daily in large numbers going to and returning to their homes and work. There are' two of these crossings, a few feet apart, running parallel to each other and to Harvey’s Canal, and perpendicularly to the Mississippi river. The child was standing, when struck, upon the lower of the two crossings, — that is to say, the one farthest from, the bridge, and nearest to New Orleans on the river side, — and just outside of the rails, sufficiently close to the rails to be struck by some part of the passing engine.
The track of the Morgan’s Railroad runs .parallel with the Mississippi river, and not very far back from it. Harvey’s Canal is about 90 feet wide, and is spanned by a bridge constructed over it by the defendant as part of its line. Just east (next to the New Orleans side) of the canal the defendant has constructed a bridge tender’s house and a toolhouse, and across the crossing, where the child was struck, and about 10 to 14 feet from the river side rail, it had erected a gate, with open spaces between the cross planks, which was rarely closed, but permitted to swing open towards the railroad track.
We are called upon to determine whether, under the circumstances and conditions the child was struck, defendant’s officers and em-' ployés were at fault or not, and, if so, whether there be any reason why plaintiffs should not recover damages.
As usual in such cases, there is conflicting testimony. The district judge, who saw and heard the witnesses,' and, with the consent of counsel of both sides, viewed the premises with them, reached the conclusion (for reasons assigned in a lengthy written opinion) that defendant was legally responsible, and rendered judgment against it.
We have carefully examined the record,. and we find no error in the judgment other than the amount of damages awarded. Defendants insist that, even if its officers and employés were at fault, plaintiffs cannot recover, as they were guilty of contributory negligence in permitting a child of that age to go so near their track. The plaintiffs are people in humble life, with slender means, dependent upon their labor for support, and unable to employ servants. They have a number of small children, and it was manifestly impossible for the mother, engaged in household duties, to have her eyes constantly upon them. This child, on the day in question, was with a number of other children, who had gone to the neighborhood of defendant’s track, and were there playing marbles. There is no reason to suppose the mother knew where it was. She testified that she thought it had accompanied its father, who had gone to work in his truck garden, some distance off. The child, to get where it was, had to pass a number of houses in which families lived, some of the members of which were sitting upon their galleries that Sunday afternoon, and likely to intercept it if thought to be passing into danger.
On this subject of contributory negligence by the parents as barring their right to themselves recover damages for injuries to their child it has been said: “Even in an action by the parent or master, however, it is to be remembered that he must be actually in fault in order to bar his recovery on the ground of his contributory fault. This branch of the rule has sometimes been overlooked, but it has been well pointed out and enforced in later cases, especially in Pennsylvania. Where a parent or guardian has done all which can be reasonably expected of one in his circumstances, he is not debarred from recovery by the mere fact that he has not thrown as many restraints around his child for its protection as would be reasonably expected from parents having more means at their command. Thus a poor woman earning her daily bread is not necessarily in fault because she does not restrain her child from wandering in the street. In these and all other similar cases all the circumstances are to be taken into account, and the question to be determined is whether the plaintiff took as much care of his child as reasonably prudent persons of the same class and the same means ordinarily do.” Shearman & Redfield on the Law of Negligence, vol. 1 (5th Ed.) § 72.
In estimating what care is required of a parent, Jaggard (on Torts, § 278) says: “Do *907 mestic exigencies, as the sickness of the mother, or her exhausted condition, are proper matters for consideration. Thus, where a sick mother sends her boy on a necessary errand across the street, such an act is not necessarily contributory negligence. * * * But the parent is bound to exercise care with reference to circumstances, and is not bound to anticipate carelessness on the part of others. And if the defendant, in the exercise of ordinary care, could have averted the parents’ negligence, the infant or his representative may recover. If, however, the danger of the child could have been discovered by the defendant in time to avoid injury to it by the exercise of ordinary care, neither the parent’s nor the child’s right to recover is barred by this alleged contributory negligence in allowing it to be at large unattended.”
We do not think the situation in this case, as disclosed by the testimony adduced, was such as to cut off the plaintiffs’ right to recovery. We are satisfied that the whistle was not blown and the bell was not rung either when the engine emerged from the bridge nor at any time thereafter before it reached the crossings.
We are also satisfied that the speed of the engine when it reached and passed through the bridge was not reduced to 12 miles an hour, nor that, when it emerged from the bridge (when the speed was admittedly increased), it was only increased to 18 miles an hour. Though plaintiffs’ witnesses were not expert witnesses on this subject, we think, where an engine is traveling at such speed as to call at the time for exclamations of surprise from persons seeing it who lived along the line of road, and were accustomed to seeing engines pass at all times of the day, their testimony is entitled to weight. Mr. Robert Harvey and Mr. Mathews, gentlemen living at Harvey’s Canal, spoke of the speed before the accident occurred, and a Mrs. Bartello said that, on seeing it approaching, she exclaimed, “My God! where are my children?” We are convinced that the engine was running at an unusual rate of speed, and, in view of the existing conditions, at a dangerous rate of speed.
If true it was that the speed was reduced to 12 miles an hour in passing through the bridge, it should not have been increased, but should have been kept reduced until it passed the crossings, which were only a few feet below the bridge crossings, which were crossed at times as many as 600 times a day, according to testimony in the record. There was no reason shown for this speed. It is not claimed that the engine was called upon to clear the way for other trains, and it was returning to and would soon reach the terminus of the road, there to be put away for the night. It was particularly imprudent to increase the speed of the engine at half past 4 o’clock in the afternoon of a Sunday when the workmen in. the mills were freed from work, and were likely to be constantly crossing the tracks. It was also great' imprudence and. negligence to increase the speed at that place, if true it was, • as is claimed by the defendant, in attempting from another standpoint to shield itself from liability, that the line of vision of the engineer and firemen was cut off to a very great extent by obstructions which it had itself placed near its left-hand track — the track the view of which would be to some extent additionally masked from the engineer by the boiler.
We find from the record that just so soon as the engine emerged from the eastern or New Orleans end of the bridge, the fireman betook himself immediately to shoveling coal in the furnace, leaving the engineer exclusively in charge of the lookout upon the left-hand track of the road. He could well have postponed and should have postponed doing this work at such a place, at such a time, and under existing conditions, until after the crossings had been passed. There was no occasion for his firing up at that precise time, but certainly, if he did give up watching himself the left-hand side of the track, and leaving it to be watched by the engineer, and therefore practically unguarded for the time, he should, before doing so, have rung his bell, and called upon the engineer to continue to do so, and to blow his whistle. Neither he nor the engineer was justified, under the circumstances, in approaching this obstructed track and dangerous crossings at such speed without proper and reiterated warnings. There were a number of childr' playing in close proximity to the right-hand track of the road, who, had the whistle been blown and the bell been rung, could, and doubtless would, have guarded the child, even *909 had he himself not understood the meaning of the signals, and not protected himself. We are not warranted in assuming, for the benefit of the defendant, that the child itself would not have been placed upon its guard. We may say here, in connection with the presence of the children just referred to, that it is strange, if the engineer was keeping a strict lookout, that he should not have seen them. He enumerates specifically the' persons he saw along the track, and yet does not refer to them at all. He says (as also does the fireman) that he saw nothing of the boy who was struck, and did not know he had been struck until the next day. He says the child, in approaching the left-hand track, must have been masked by the obstructions along that track, and emerged from behind the obstructions only after he had got so close to that track that he (the engineer) could not see him across the boiler. The existence of that condition of things might exonerate the engineer personally from blame for not seeing the child, but it could not be set up as a defense by the defendant company. It had no right to place itself obstructions upon or near its line in manner as to intercept the view of the engineer, and leave part of its track really without a lookout and unguarded. If physical conditions should be such as unavoidably to bring about a situation of that character, the company could be called upon by every means and instrumentalities in its power to minimize the danger. It should see that a special lookout be kept on the obstructed side of the line until the danger point be passed. It should not permit the party in charge of that side of the track to withdraw from that duty just at that critical moment, to do other work not then necessarily called for. It should reduce the speed if necessary, and give repeated danger warnings and signals. If the gate referred to in the testimony was an obstruction to the view, the defendant, having erected it, and having control over it, should have removed it either entirely or to another place. Shear. & Red. Negligence, vol. 2, §§ 417, 460, 463: Jaggard on Torts, § 256 (p. 882); Am. & Eng. Ency. of Law, vol. 4, 911 (and note) and 920; Delaware R. R. Co. v. Shelton, 55 N. J. Law, 342, 26 Atl. 937; Louisville R. R. Co. v. Hackman (Ky.) 30 S. W. 407; Hubbard v. Railroad Co., 162 Mass. 132, 38 N. E. 366; Shaber v. Railroad Co., 28 Minn. 103, 9 N. W. 575; State v. Boston R. Co., 80 Me. 430, 15 Atl. 36.
The engineer and other officials of the defendant in their testimony referred to the fact that the crossings in question were not highways, or public, but private crossings; that, therefore, the company was not called upon to put up whistling posts, or to give any special signals or warnings. They further referred to the fact that the engineer on this occasion was authorized by the rules of the company to run at the speed he did.
There is, of course, a recognized difference in law for certain purposes between a public and a private road. It may be that the fact that a particular crossing may be a public crossing should carry with it as a consequence that the railroad company should be called upon to establish a whistling post, and give certain signals on approaching it; but it by no means follows that, because a crossing is a private crossing, the company and its employes should ignore its existence, and the special dangers attendant upon approaching it, and be released from all care, prudence, and caution in doing so. Employes of a company, by conforming to its rules, may be released from blame as between themselves and their employer, but if the rules themselves be such as to cause them to do something which they were not justified in doing, or in failing to do something which they were called upon to do, the rules would not save the legal situation, so far as the company was concerned in its relations with others and with the public. The rules would be a detriment and injury to it.
In Downing v. Railway Co., 104 La. 519, 29 South. 212, we said: “It is a mistake to suppose that by pursuing the regulation method of giving notice by the ringing of a bell or following out any prescribed mode of giving warnings, parties in charge of a railroad train perform their whole duty under every contingency or on all occasions. The precautions to be adopted and the steps to be taken in aid of safety increase as the danger of accident and injury is increased, and their sufficiency is to be gauged by what is called for by the special circumstances of each case.”
In Lampkin v. McCormick, 105 La. 422, 29 South. 954, 83 Am. St. Rep. 245, we repeated *911 that 'warning saying: “It may be that these obligations were not imposed by general ordinance or statute, but there are certain obligations imposed upon railroad corporations which exist independently of convention or ordinance or statute. There is a duty imposed upon every one, whether natural persons or artificial persons, to avoid by proper care doing injury to others through their fault.” See the views of this court on the same subject expressed in Sundmaker v. Yazoo & Miss. Railroad Company, 106 La. 112, 30 South. 285. The case as presented, even from the point of view urged by defendant, is one where a railroad crossing, at which a very large number of persons have been in the habit for a number of years of legitimately crossing, and the approach to which by the persons crossing is obstructed, on the side opposite to that on which the engineer is on the lookout, from the view of the engineer by obstructions placed on the line of view by the railroad company itself, has been crossed by an engine and caboose moving at a very great and dangerous rate of speed, without having given the precautionary signals of approach which prudence and a due regard for the safety of the public at the crossing called for, and when at the same time the fireman in charge of a lookout on the obstructed line of view has left 'his post, and intrusted the duty of looking out on his side to the engineer, who, by reason of the obstructions, could not see parties at or approaching the crossing in time to save them from injury. We cannot relieve a railroad company from liability for injuries received under such conditions.
We reaffirm the doctrine announced in the Downing and Lampkin Cases as to the duty of railroad employes when approaching danger points. We repeat what was said in the Downing Case — that to run a train at a high rate of speed, and without precautionary signals, or with signals manifestly insufficient to meet the requirements of a proper warning of approach, where trainmen have reason to believe that there are persons in exposed positions on the track (as over unguarded crossings in a populous district of a city, or where the public are wont to cross on the track with such frequency and numbers as to be known to those in charge of the train), they will be held to a knowledge of the probable consequences of maintaining great speed without warnings, so as to impute to them reckless indifference in respect thereto, and render their employers responsible for injuries therefrom, notwithstanding there was negligence on the part of the injured, and no fault on the part of the servants after seeing the danger. The doctrine is not based on the idea that they should sooner have observed the danger, however, but on the ground that they knew of its existence, of the presence of people in positions of peril, as a matter of fact, without seeing them at all in the particular instance.
It is urged that at the time the child came near the track the engine could not have been stopped by any known appliances. Conceding that statement to be true, it would not follow that the child could not have been saved. Had proper warnings been given, the child might have saved itself by withdrawal from its position, or by the assistance of others acting for its protection. Its playmates might have possibly saved it in this instance. We are satisfied that the child’s life could have been saved by proper care and action taken by the employés of the defendant, even after he had got into a position of danger. While we think judgment should be rendered in favor of the plaintiffs against the defendant, we are of the opinion that the amount awarded for damages is too large, and that the judgment appealed from should, as to amount, be reduced. There is error, also, in decreeing that the amount awarded should bear interest from judicial demand. Interest should commence to run only from the date of judgment. Preston v. Slocomb, 1 La. Ann. 382; Green v. Garcia, 3 La. Ann. 702; Wright v. Abbott, 6 La. Ann. 569; Black v. Carrollton R. R. Co., 10 La. Ann. 39, 63 Am. Dec. 586; Robertson v. Green, 18 La. Ann. 28.
For the reasons herein assigned, it is hereby ordered, adjudged, and decreed that the judgment appealed from be amended by reducing the amount of the judgment from $10,000 to $4,000, and'further amended by making the amount of the judgment bear legal interest from, date of the judgment of the district court, the 18th of March, 1902, until paid, and that, as so amended, the judgment be affirmed; costs of appeal to be paid by the appellee.