(68 South. 379)

No. 20157.

JONES v. MACKAY TELEGRAPH CABLE CO. et al.

(April 26, 1915.)

*(Syllabus by the Court.)*

1. NEGLIGENCE ⊙⟶74—CONTRIBUTORY NEGLI-GENCE—RESCUE—EMERGENCY.

One who suffers personal injury by risking his life to save the lives of others in danger is not to be charged with contributory negligence for failing to exercise his best judgment in the emergency.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. § 102; Dec. Dig. ⊙⟶74.]

2. RAILROADS ⊙⟶390—NEGLIGENCE OF ENGI-NEER—LAST CLEAR CHANCE—CONTRIBUTORY NEGLIGENCE.

A railroad company is liable in damages for personal injuries resulting from the negligence of its engineer, who had the last clear chance to avoid the accident, even if the person injured was originally guilty of negligence in creating the situation of danger to himself and others.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1324, 1325; Dec. Dig. ⊙⟶390.]

Appeal from Thirteenth Judicial District Court, Parish of Rapides; W. F. Blackman, Judge.

Action by Jack Jones against the Mackay Telegraph Cable Company and others. From judgment for plaintiff, defendants appeal. Affirmed.

Dufour & Dufour, of New Orleans, and Andrews, Hakenyos & Scott, of Alexandria (George Janvier, of New Orleans, of counsel), for appellant Texas & P. Ry. Co. Sam S. Mims, of Alexandria, for appellee.

O'NIELL, J. This is a suit for damages for personal injuries inflicted upon the plaintiff by a passenger train of the Texas & Pacific Railway Company while he was employed with a construction gang of the Mackay Telegraph Cable Company. He prayed for judgment against both companies in solido for $20,000. The trial was had in the district court without a jury, and resulted in a judgment in favor of the plaintiff for $4,-000 against the railway company and in favor of the railway company for the same amount against the telegraph company on a contract of warranty. The defendants prosecute this appeal.

[1, 2] A crew of about 25 men, under the direction of a foreman, was constructing a telegraph line along the north or northeast side of the railway, 22½ feet from the main track. The work was proceeding in a western or northwestern direction, towards Alexandria. The poles were distributed at proper distances along the track. A crew of men attached the cross-arms; another crew followed, dug the holes, and erected the poles; and the linemen came after, stringing the wires. The plaintiff was working as a laborer with the crew stringing the wires on the poles. They were using two hand cars; one carrying the reels of wire, and the other following with the blocks and tackle, which were used for tightening the wires on the cross-arms.

On the morning of the accident, the plaintiff was getting the blocks and tackle from one of the poles on which they had been used and was putting them on the hand car to be brought up for use on the wires that were being strung out from the other hand car half a mile ahead. The plaintiff was working alone. The linemen were putting up the wires on the poles further west, and the other members of the crew were with the front hand car, except one, Ike Johnson, who stood on the railroad track, about midway between the two hand cars, giving signals to the linemen on the poles and the men on the ground. The foreman came up the track, walking towards the west, and, according to his testimony and that of Ike Johnson, he had passed by the plaintiff and had gone about a hundred yards past Ike Johnson, when the accident occurred. The train that struck the plaintiff, or struck the hand car which he was handling, was going west, to Alexandria.

The foreman testified that when he passed the hand car, near which the plaintiff was working, he had just seen the smoke from the approaching train, about four miles away, and he then warned the plaintiff to get the car off of the track. He says there was a switch or siding a few hundred feet east from the hand car. He first estimates this distance at 500 to 600 feet, and then says it might have been only 200 or 300 feet away. He says he warned the plaihtiff of the approach of the train five or ten minutes before the accident, and that he also warned Ike Johnson when he passed him on the track. The foreman did not know that an accident had occurred until the train had passed and Ike Johnson came running to him and told him that Jack Jones had been killed.

The plaintiff testified that the train was within a mile from the hand car when the foreman ordered him to get the car off of the track; that he ran immediately to the car, shoved it a short distance, then jumped upon it, and propelled it with the hand beam to the switch, which, he says, was only about 16 feet from where the car had stood. Just before he got the car to the switch, Ike Johnson came to his assistance. The switch being closed and locked, the two men ran to the front of the car, lifted the front wheels over the rails, and pulled the car partly onto the siding, then ran around behind the car and shoved it onto the switch track; but, before they could get it far enough from the main track, the passenger train was upon them. The pilot on the locomotive struck the rear end of the hand car and knocked the plaintiff senseless.

Ike Johnson, who was a witness for the defendants, testified that, when he first saw the train approaching, it was about two miles away, and he was about a quarter of a mile from the hand car. He ran to assist the plaintiff in getting the car off the track and met the car just before plaintiff got to the switch with it. The train was then so close upon them and coming so fast that he suggested trying to take the car off of the track without going onto the switch, but plaintiff preferred to run it onto the switch. He said it seemed to him that they could have got the car off in less time without running it onto the switch; but he admits that they worked as fast as they could and got the car onto the switch as quickly as it could have been done.

Two disinterested colored witnesses testified that they were on the porch of a house about 50 feet south from the track, diagonally opposite the scene of the accident. Before they saw or heard the train approaching, their attention was attracted by the plaintiff's running to the hand car and struggling to get it off of the track. They then saw the train about a mile away, coming so fast that one of these witnesses said to the other, "That train will catch him before he gets off there." They corroborate the plaintiff's and Ike Johnson's statement that they worked as fast as possible but could not get the car out of the way of the train before it overtook them.

The defendants contend that the plaintiff was guilty of negligence in failing to follow the suggestion of Ike Johnson to lift or throw the car off of the track instead of taking it to the switch. There is no proof, however, nor reason to believe, that two men could have lifted or otherwise removed the car from the track in less time than it required to shove it to and upon the switch. The evidence is that it required four men to lift the car bodily off the track, and that two men could get it off by lifting one end and then the other over the rails; but it does not appear that this was such a quick and easy way for the two men to remove the car that the plaintiff should have jumped at the suggestion. There was no time for him to stop and calculate whether he and Johnson could lift the

car off, one end at a time, more quickly than they could shove it to and upon the switch. Perhaps many human lives depended upon the accomplishment, in a limited time, of what the plaintiff and Ike Johnson were risking their lives to accomplish. A lack of judgment, under such circumstances, cannot be regarded as negligence on their part.

The defendants also contend that the plaintiff did not begin to move the car off of the track immediately when he was warned by the foreman that the train was approaching. There is a conflict in the evidence on this question, which we are not called upon to decide on this appeal. The plaintiff did not perfect his appeal from the judgment, absolving the defendant telegraph company from any liability to the plaintiff. Nor has he, as appellee in this court, prayed for an amendment of the judgment. The issue presented in the appeal, therefore, is whether the engineer on the passenger train was negligent, and, if we conclude that he was at fault, then the question arises whether the plaintiff was also guilty of negligence, contributing to the accident; and, if we find that they were both negligent, we come then to the final issue whether the plaintiff or the engineer on the passenger train had the last clear chance to avoid the accident.

It occurred on a bright morning between 8 and 9 o'clock. The track was straight at the scene of the accident and for a distance of two miles or more each way, with open, level fields on both sides.

The engineer testified on behalf of the defendants as follows:

"Q. Do you remember an engine of yours striking a hand car, or a colored man, on the main line, or near the main line, about two or three miles south of Alexandria, about that time? A. I remember that the engine showed signs of hitting something. Q. What do you mean by signs? A. I mean that a step on the pilot of the engine was knocked off, and I remember having seen a hand car that was close to the track on Pendleton's spur. Q. On what side of the track? A. On the left-hand side of the track. Q. Is that your side of the engine? A. No, sir; that is the fireman's side. Q. How far was that hand car from your engine when you first saw it? A. That would be difficult to say how far it was, but perhaps 250 or 300 feet, something like that. Q. Do you recall how fast you were going? A. I think about 40 miles an hour. Q. Do you remember whether you whistled for that hand car? A. I whistled just before I got to the men; saw some men working there; and I blowed for the road crossing. I whistled to warn them of the approaching train. Q. Do you know whether there was a man on the hand car at the time? A. I seen one at the hand car, and there were several around there, it seemed like. But one man had his hand on the handle of the hand car. Q. Would you recognize that man if you saw him again? A. Don't think I would, but he was a colored man. Q. How long have you been an engineer? A. I have been working for the Texas & Pacific as an engineer since 1890. Q. Have you had any experience during that time with hand cars and obstructions on the track? A. That is the only hand car I ever struck, and I am not positive that I hit that, but am almost sure that I did, on account of these signs. Q. Did you know at the time that you hit it? A. No; I did not know at the time that I had hit it. Q. What is your custom with regard to the slowing up and stopping of your engine when you see a hand car on the track ahead of you? A. We presume that they will take the hand car out of the way, and don't pay much attention to it; give them warning signals and they are supposed to keep them out of the way. Q. Is that custom limited to your own practice in the running of trains, or is that custom general with engineers? A. I think that is the custom in railroading. Q. Is it usual or unusual for you to see hand cars on the track ahead of you? A. Well, we see them quite often on the track. It is an almost everyday occurrence. Q. How far were you from that hand car when you gave them that whistle that you say you gave them? A. Probably about 250 or 300 feet—about a block, I suppose. Q. You say your train was going approximately 40 miles an hour, and there is a hand car, say 200 or 250 feet in front of you, in charge of two colored men, and is a hand car such as is ordinarily used; could two men get that car off before your train got to it? A. I would think so. They would only have to shove it west a little more on the spur track. The car was almost in the clear when I saw it. Q. What is the condition of the track there? Is it a straight track or a curved track? A. It is a straight piece of track there for several miles. Q. Can you explain how it is that you did not see that hand car sooner than you did? A. The hand car was on the spur track on the left-hand side, and I did not pay so much attention to it until I approached it closer. Q. You mean you did not see it, or pay attention to it? A. I did not pay much attention to it. It was not on the main line. It was not struck on the main line, but struck on the spur track. Q. You saw

the hand car there, saw it on the spur, and saw a man there with it? A. Yes, sir. Q. See any one else there but the one man? A. I saw one man with his hand on the car. Q. Did you see any other men around there? A. There were several other men around there, but I don't know exactly how close they were. Some of them were tolerably close, but I don't know how far they were."

There is no dispute of the fact that, with the exception of Ike Johnson, who ran nearly a quarter of a mile to the hand car while the train covered a distance of about two miles, the other men were half a mile away.

On cross-examination the engineer repeated that he did not see the hand car until he was within 250 or 300 feet from it. And adds:

"I began to realize it was not in the clear when I got up close. When I first saw the car it looked like it was probably clear, but, when I got a little closer, I thought perhaps the pilot of the engine would strike the hand car."

He admitted that he could have seen the car from a distance of at least 4,000 feet and possibly a mile. "But," he explains, "if a car is standing on a side track, almost in the clear, and you could not say but you would presume that the men would remove the car, that is their duty to keep them out of the way." He admitted that he did not slacken the speed of his engine in approaching the hand car, and did not remember whether the bell was rung. But says:

"I blew the whistle, when I realized the fact that the car would not clear the track, to warn the men to shove the car down in the direction I was going."

He said he could have slowed down his train in an instant by applying his brakes, and could have brought it to a "dead stop" in a distance of 700 feet.

The fireman of the locomotive that struck the hand car did not testify. It was admitted, however, that he was present in court on the first day of the trial, but through some misunderstanding he had returned to his work when he was called as a witness for the defendants. It was also admitted that, if present, he would testify that he was shoveling coal at the time of the accident and did not know it had happened; that he saw nothing of it, and did not remember whether the whistle was blown.

From his own testimony, therefore, it appears that the engineer could have seen the hand car on the track from a distance six or seven times as far as was necessary to bring his train to a standstill and avoid the accident. His blowing the whistle, when he was within 250 or 300 feet from the car and "realized that it would not clear the track," as he says, "to warn the men to shove the car down in the direction he was going," was no help whatever to them. He was traveling at the rate of 60 feet a second. The blast of the whistle allowed them less than five seconds in which to increase their efforts, if they were not, in fact, already moving the car as fast as they could. It was time they needed, not warning—not the whistle—but the brakes.

Assuming that the plaintiff was guilty of negligence in not beginning to move the hand car sooner than he did, the engineer had ample time to stop his train while the plaintiff was trying to get the car off of the track. Even after he realized, as he says, that the hand car would not clear the track, he might have avoided the accident by applying his brakes and delaying the train only a few seconds, instead of blowing his whistle and rushing on.

Our conclusion is that the engineer had the last clear chance to avoid the accident.

The foreman and another employé of the defendant telegraph company testified that, after the plaintiff left the hospital and was given easy employment by this defendant, he acknowledged that his injuries were due to his own fault. The foreman said:

"He told me if he had taken my advice and got the car off he would be a well man to-day. He says: 'Cap, if I had taken your advice, I would be a well man to-day. It was my own fault.'"

The other witness, a colored employé who came from Birmingham to corroborate the testimony of the foreman, testified that, on several occasions, the foreman said to the plaintiff:

"If you had listened to me, you would not have got hurt."

And the plaintiff invariably replied:

"Yes, sir; Cap, if I had listened to you, I would not have got hurt."

Such statements are entitled to very little consideration. It was very natural for a humble, afflicted negro employé not to take issue with his employer or provoke a controversy with him as to who deserved the blame for a serious accident. Giving this acknowledgment all the importance that can be put upon it, however, it merely meant that, as between the plaintiff and the foreman of the telegraph company's construction gang, the plaintiff acknowledged that he was at fault in not beginning to move the car as soon as he was warned to do so. That did not exonerate the defendant railway company from its responsibility for the failure of its engineer to avail himself of the last clear chance to avoid the accident.

The physicians and surgeons who attended and operated upon the plaintiff testified that his injuries came very near being fatal and will forever prevent his doing hard work. Several ribs were broken and driven into his right lung and through the diaphragm separating the chest cavity from the abdomen. The lung sloughed away almost entirely, and the broken ribs had to be removed, leaving no support for his right shoulder. The shoulder blade was also broken. He was confined in the hospital more than two months, suffering intense pain for the first six weeks. Before the accident, he was a big, robust, healthy man. The amount of the judgment is not excessive.

The judgment appealed from is affirmed.