THOMPSON, J.
This is an action by the father for damages for the death of his seven year old daughter, alleged to have been caused by the negligence of the agents, servants, and employes of the Director General of Railroads in the operation of the Missouri Pacific Railway.
The child was injured about 8 o’clock on the evening of September 2, 1919, and died at 2:15 p. m. of the following day. The accident occurred when the child was in the act of crossing the switch or transfer track connecting the Missouri Pacific Railroad with one of the switch tracks of the Louisiana Western Railroad in the city of Lake Charles. The switch or transfer track was used to interchange cars between the two railroad companies.
The negligence imputed to the railroad employes consists in the failure to observe certain rules of the company relating to the operation of trains, and to the failure to have a light on or a lookout at the rear car of the train to warn pedestrians that the train was about to back across the pathway where it was known that pedestrians were constantly crossing, and in backing the said train without giving any warning by blowing the whistle or ringing the bell.
The defense is a denial of any negligence on the part of the servants and employes of the defendant, and a plea of contributory negligence on the part of the child, on the part of the child’s father, and on the part of the woman in whose care and custody the child is alleged to have been at the time of the accident.
*352 It is alleged that the child was a trespasser upon the exchange or transfer track which was within defendant’s railroad yards and was not a public or private crossing.
There was judgment in the loWer court in plaintiff’s favor for $2,500, and the defendant appeals.
The testimony shows that on the evening of the accident one Catherine White went to the home of the plaintiff and took his three year old clyld in her arms and started to a store near the intersection of Franklin street with the right of way of defendant’s railway. The deceased girl, who was a few months under seven years of age, and two other young girls followed Catherine White. The plaintiff was not at home at the time, and knew nothing about the visit of the woman to his home, nor that his child had gone away with her, until after his child had been run over.
The woman, with the child in her arms, and the girls following a short distance behind her, traveled along a path which ran alongside the right of way of the Louisiana Western Railroad. This path was constantly used by pedestrians, and in order to get to the store near Franklin street it was necessary to cross the switch or transfer track connecting the Missouri Pacific with the Louisiana Western.
There was a string of freight cars, consisting of 19 box cars, sending on this exchange track. The last car to the north or west was uncoupled and stood some two feet away from the one next to it. The end of the last car was near to or even with a common passageway leading across the track. There is some conflict in the testimony as to whether this last car extended across and covered or blocked the pathway, and also as to whether the woman and the girls who succeeded in crossing the track did so on the pathway or by going arpund the end of the car. There, was no 'movement of the cars— they were dead-still — and there was nothing to indicate that the cars were about to be moved as the woman and little girls approached the crossing.
The place was not lighted; there was no light on the end of the rear car, and no one at that place to give any warning of the movement of the cars. It is admitted that the bell was not rung and no other signal or notice of the contemplated movement of the cars was given except the three sharp blasts of the whistle, which, being located some 900 feet away from the crossing, might as well not have been given, for it could not have been-heard at the place of crossing (owing to the great noise and confusion occasioned by the constant blowing of whistles) except perhaps by those whose special duty it was to be on the lookout for such whistles in answer to signals given.
The woman and three of the girls, who were some 10 feet behind her, crossed over the track, but as the other one got on the track there was a sudden movement of the cars backward, the rear car knocked her down, and the rear wheel passed over her right leg, mashing her leg up to and including her hip. The car was stopped, and the wheel rested on the child for several minutes until the screaming of the other children attracted the attention of those in charge of the train, when the signal was given and the cars were pulled forward.
It is shown that the conductor and a switchman made an inspection of the box cars just before they were to be moved, but it is not shown how long this was before the signal was given to the engineer to pull out. It is a fact, however, that neither the conductor nor the Switchman saw the woman and-children, on their route of inspection, nor did the woman nor any of the children see either the conductor or switchman about the train of cars. The woman and children traveled along the north of the cars and crossed the track to the south. The switch- *354 man says that he was near the end of .the rear ear on the north side of the car, and had to go on the south side to give his signal to the engineer, owing to the curve in the switch track. But, whatever position the switchman occupied, it cannot be reasonably claimed that he was at the rear end of the car, or was in a place where his presence could have afforded protection or served as a warning to pedestrians crossing the track at that place.
The pathway where the accident occurred was not a public crossing — that is to say, in the sense that it had been dedicated as a public street or thoroughfare by the city of Bake Charles — but it was being constantly used by the public in general as a crossing to the knowledge of the railway company. Indeed, it is in evidence that the only way to get to the south side of the transfer track, where the store is located, to which the woman White was going at the 'time of the accident, is to cross this transfer track; and the most convenient place and the place generally made use of was the path or the adjacent vacant space which was made use of on the occasion in question.
If the injury and death of plaintiff’s child had occurred at a public street crossing under the cireumstancesi and conditions as stated and as disclosed by the record, there could be no sort of doubt of the defendant’s negligence; for, as held in Aymond v. Western Union Telegraph Co., 151 La. 184, 91 South. 671:
“It is gross negligence for a railway company to back a long train over a dark and unguarded crossing, in the heart of a populous city, without a light ahead to mark its presence or lookout preceding to give warning of its approach; the noise of the locomotive far in the rear being no indication that the dark and silent ‘lead car’ is in motion.”
In the instant case every element existed to bring the case strictly within the holding in the above cited case, except that the crossing had not been legally dedicated by the city authorities as a public street or thoroughfare.
The train was long, the crossing was dark, there was no light on the- rear car, and no lookout present to give warning of the starting of the train. The cars were dead and immovable as the pedestrians approached the crossing, and no sound was given, no bell was rung, and nothing whatever appeared to indicate that the cars were to be started up, except the whistle of the locomotive some 900 feet away, and which was heard only by the switchman who was some distance away from the crossing.
Our conclusion is that the fact that the crossing had not been legally dedicated by the city as a “public crossing” did not relieve the defendant of the duty otherwise imposed on it. After all i& said, the fact remains that the place where the little girl met a tragic death was not an isolated and unfrequented crossing, as contended, but had from constant use become a public and popular crossing for all intents and purposes of the public, and was so regarded by the public; and this to the full knowledge of and without any objection from the railroad company. In this situation the company cannot be heard to say that in crossing this track the little girl was a trespasser to whom the company owed no duty further than not to wantonly injure her. The company did not perform its whole duty.
“The precautions to be adopted and the steps to be taken in aid of safety increase as the danger of accident and injury is increased, and their sufficiency is to be gauged by what is called for by the special circumstances of each case.” Downing v. Railway & Steamship Co., 104 La. 519, 29 South. 207.
In the case of Ortolano v. Morgan’s L. & T. R. & S. S. Co., 109 La. 910, 33 South. 914, it was said:
“The engineer and other officials of the defendant in their testimony referred to the fact that the crossings' in question were not high *356 ways, or public, but private crossings; that, therefore, the company was not called upon to put up whistling posts, or to give any special signals or warnings. * * *
“There is, of course, a recognized difference in law for certain purposes between a public and a private road. It may he that the fact that a particular crossing may be a public crossing should carry with it as a consequence that the railroad company should be called upon to * * * give certain signals on approaching it; but it by no means follows that,- because a crossing is a private crossing, the company and its employees should ignore its existence, and the special dangers attendant upon approaching it, and be released from all care, prudence, and caution in doing so.”
And in Lampkin v. McCormick, 105 La. 422, 29 South. 954, 83 Am. St. Rep. 245, it was said:
“It may be * * * that * * * these obligations * * * were not imposed .* * * by general ordinance or statute, but there are certain obligations imposed upon railroad companies which exist independently of convention or ordinance or statute.
“There is a duty imposed upon every one, whether natural persons or artificial persons, to avoid by proper care doing injury to others through their fault.”
In the Ortolano Case, supra, the doctrine of the Downing and Lampkin Cases was reaffirmed to the effect that to run a train—
“ * * * without precautionary signals, or with signals manifestly insufficient to meet the requirements of a proper warning of approach, where trainmen have reason to believe that there are persons in exposed positions on the track (as over unguarded crossings in a populous district of a city, or where the public are wont to cross on the track with such frequency and numbers as to be known to those in charge of the train), they will be held to a knowledge of the probable consequences of maintaining great speed without warnings, so as to impute to them reckless indifference in respect thereto, and render their employers responsible for injuries therefrom.”
In the circumstances as presented in this case, we think the conditions existing at the crossing where the accident occurred, and where pedestrians are constantly exposed to danger, were such as to constitute gross negligence on the part of the employés of the railroad company in backing its train across the common passageway without having a lookout at the end of the car at the crossing, and without giving proper signals to afford adequate and sufficient warning of the approach, or of the intended movement, of the train.
On the question of contributory negligence little i§ necessary to he said. The learned counsel for the defendant company frankly admits that no contributory negligence attaches to a child under seven years of age under the jurisprudence of this state, especially with respect to the little girl killed in this case, who was an ordinary colored girl, immature in discretion.
But it is urged that the contributory negligence of the child is imputable to the father, and that the father himself was guilty of contributing to the death of his daughter in permitting her to “wander about railroad yards at night.” Counsel cite Thompson on Negligence and numerous authorities from other states, but not a single case in this state. Thompson on Negligence, 312, says:
“In states where the rule of imputed negligence is not applied, it is nevertheless necessary that the parent, in order to recover damages for the death of a child from the wrongful act of the defendant should be free from negligence proximately contributing to the child’s injury. The propriety of this rule will not be questioned, as the negligence which operates as a defense in such cases is purely the contributory negligence of the plaintiff in-the case, or that of some person duly authorized by the plaintiff to have charge of the child, whose negligence upon familiar principles must be held to be that of plaintiff.”
While it is true that offenses and quasi offenses when committed by minors and unemancipated children are imputed to the parents (C. C. art. 237), the doctrine of imputed negligence of want of care on the part of parents or guardians of a child of tender years to prevent recovery for injury to the *358 child does not prevail in Louisiana. Westerfield v. Levis, 43 La. Ann. 63, 9 South. 52.
Nor are parents obliged, under a penalty of having the negligence of their children visited upon them, to avoid liability for injury to such children, to restrain and keep their children within doors.
“In determining the contributory negligence of a parent in permitting her child to be in a dangerous place, the conditions and circumstances of the parent may be taken into account and she is not bound to anticipate carelessness in others.” See Ortolano Case, supra.
In this case the father was not at home, and he knew nothing of the fact that his children had left the house and had followed the woman White on her mission to the store. There could have been, therefore, no negligence on the part of the father which contributed, either remotely or proximately, to the injury and death of the child.
“The mother, who knows nothing of the absence of her child, if the child was killed in an accident which might have been avoided, cannot, unless it be shown in some way that she was negligent in regard to her child, be held-negligent.” Davidson v. Illinois Central R. Co., 124 La. 165, 49 South. 1015.
The plaintiff’s daughter was hot placed by him in the care of the woman Catherine White, and she could in no sense of the term be regarded in law or in fact as having the care, custody, and control of the child, nor be charged with any peculiar or special duty of watchfulness over the child. It is not shown that the woman White invited the little girl to go with her to the storeon the contrary, it is fair to assume from the evidence that the girl with the three other girls followed the woman of their own volition.
And whether Catherine White knew or did not know that the children were following behind does not alter the legal situation in the least. Conceding, therefore, that Catherine White was guilty of negligence in permitting the girl to go on the track behind a dead and standstill car, where people were in the habit of crossing, such negligence would not bar recovery by the plaintiff, who knew nothing of the absence of his girl from home, and who was engaged in his daily work, and had no ^knowledge of the exposed condition of his child.
The amount allowed by the district judge is not excessive. The demand is for the pain and suffering of the child from the injury and for the loss of the companionship of the child, both of which items are allowable under the law. In the case of Hebert v. Baton Rouge Electric Co., 150 La. 962, 91 South. 406, 25 A. L. R. 245, the court awarded $2,500 to each of the parents for mental pain at the loss of a young child and their loss of the companionship of the child.
In the instant case the child suffered from 8 o’clock in the evening until 2 o’clock of the evening of the following day. To say that a child, crushed and mashed as this little girl was, and fully conscious for 18 hours, suffered no great pain and agony, is to argue against natural law and everyday experience and observation. If $2,500 for each parent as allowed in the Hebert Case for loss of companionship of the child was not excessive, certainly the sum of $2,500 for the loss of the companionship of plaintiff's child, and for the pain and suffering endured by the child, cannot be said to be excessive.
The judgment appealed from is therefore affirmed'-at appellant’s cost.