No. 2575

Second Circuit

———

# JONES v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY CO.

———

•

(June 2, 1926, Opinion and Decree)
(June 30, 1926, Rehearing Refused)

———

(*Syllabus by the Editor.*)

1. **Louisiana Digest—Railroads—Par. 78.**

The engineer who sees an object on the track, does not know what it is, but knows that the track at that point is used by pedestrians is guilty of the grossest negligence if he does not stop before hitting the object and thereby take the last clear chance to avoid killing a human.

2. **Louisiana Digest—Railroads—Par. 74, 78.**

Although one who becomes intoxicated and in that condition lies down on the railroad track is guilty of negligence it will not bar recovery for his death if the engineer of the train had the last clear chance to avoid the accident and did not take it.

3. **Louisiana Digest—Appeal—Par. 625.**

The finding of the trial court as to the quantum of damages allowed for the death of a husband and father being a question of fact and not manifestly erroneous is affirmed.

Appeal from the Third Judicial District Court of Louisiana, Parish of Lincoln, Hon. S. D. Pearce, Judge.

Action by Mrs. Kate Jones, individually and as tutrix against Chicago, Rock Island & Pacific Railway Company. There was judgment for plaintiff and defendant appealed. Plaintiff asked for an increase of judgment.

Judgment affirmed.

Elder and Digby, of Farmerville, and Thompson, of Ruston, attorneys for plaintiff, appellee.

Barksdale, Warren and McBride, of Ruston, attorneys for defendant, appellant.

ODOM, J.    On Sunday evening, March 15, 1925, W. D. Jones was run over by one of defendant's passenger trains. He was found dead on the track under one of the cars with one arm cut off, one leg broken, and with bruises about his head and face.

Mrs. Kate Jones, his surviving wife, individually and as tutrix of her two minor children, issue of her marriage with deceased, brought this suit to recover damages in the sum of $30,000.00, alleging that the deceased was run over and killed by defendant's train through the gross fault and negligence of those in charge thereof.

In answer, defendant admitted that its train ran over the body of the deceased, as alleged, but denied that it killed him, and averred that—

"* * * at the time the train passed over the body of the deceased the deceased was already dead either from heart disease or some other cause."

And, in the alternative, in case the court should find that its train caused the death of the deceased, then it is alleged that the deceased was lying on its track in a drunken condition; that he was guilty of the grossest kind of negligence in being

thus drunk and on its track; that he was a trespasser, without any right on its property; that its train was equipped with the best of modern appliances, all of which were in perfect condition and working order; that the plight of the deceased was discovered as soon as it was possible to do so; and that after the body was discovered on the track the engineer did everything possible to avoid striking it, and that after the body was discovered it was impossible to avoid running over it.

There was judgment in the lower court for plaintiff for $8,000.00, from which defendant prosecutes this appeal. Plaintiff filed a motion in this court to amend the judgment by increasing it to $15,000.00.

## OPINION

On the evening of March 15, 1925, at about 7 o'clock the deceased was at the "Red Onion" cafe in Ruston in an intoxicated condition. He complained of feeling bad and Mr. E. A. Garr offered to take him home in an automobile, which offer was refused, and shortly thereafter he started to walk to his home, which is on a farm about one mile south of Ruston, adjoining the railroad right of way. From the fact that the deceased was found lying on the railroad track, it is likely that he used the track as a footpath.

Shortly after the deceased left the cafe, the defendant's passenger train left the station and proceeded on its way south. From the station south to what is called South Line street the track makes a considerable curve to the left, but from about that point it is straight for something like a mile.

There were a number of persons congregated at or near South Line street when the train passed who saw the train make a sudden stop when about 450 feet south of that point. None of them, however, saw the deceased on the track nor did any of them know why the train had stopped.

When the train was brought to a full stop, the body of the deceased was found dead on the track beneath one of the cars with one arm cut off, one leg broken and with bruises or wounds about the head and face, and from blood and other signs on the rail and track it seems that the body was dragged along the track a distance of about 60 feet after being struck.

The only eye witness to the accident was Mr. William Geister, the engineer in charge of the engine. Mr. Geister is 62 years old and has been a locomotive engineer about 42 years. In a written opinion, which we find in the record, the district judge stated that Mr. Geister impressed him as being thoroughly honest and truthful and that apparently he made no effort to shade or color the facts in order to shield himself from blame or relieve his company from responsibility. We therefore accept his version of the accident as correct, which is as follows:

"When I left Ruston station it was about 7:10 p. m. It was dark, had been drizzling rain all evening, and as I was running south, rounding the curve at that crossing down there that you call South Line crossing, and before I got around the curve just at the point of going around the curve I saw an object lying next to the right hand rail going south, but I couldn't tell what the object was until I came within about fifty feet of it. Then I discovered it was a man. * * * Then I made all possible effort to stop. * * I stopped just as quickly as it was possible to stop. * * * In about a hundred feet or a little over. * * * It was the body of a man lying full length against the right hand rail and on the right side of his face, full length—head south— full length, stretched out, with his heels up in the air * * * made no movement at all."

He further said that the man's clothing was rather brown or dark color and—

"At first when I saw the object I couldn't tell what it was, until I got the vision of the headlight on him. Then I discovered it was a man."

He further said that—

"The engine would have to be at least twenty or twenty-five feet from the crossing before the focus would be in the center of the rails."

He was asked what there was about the object when he first saw it to indicate that it was the body of a man, and he said—

"Many times an object shows up in front of you that you don't recognize until you get on to it. I could only see it was an object."

There is some conflict between the testimony of Mr. Geister and that of the other witnesses as to how far he was from the man when he first saw him on the track. Mr. Geister could not tell exactly, but said he saw the object on the track when the engine was 20 or 25 feet south of South Line street and that he struck the body about 300 feet south of that street. Other witnesses, who made measurements, testified that the body was picked up 480 feet south of that street. So that if Mr. Geister is correct in his statement that he first saw the object when he was 20 or 25 feet south of the street, he must have seen the object when he was approximately 400 feet from it. The district judge, after considering all the testimony, reached the conclusion that Mr. Geister saw the object on the track when he was some 250 or 300 feet from it and that that is probably correct. However, the exact distance is not material, because Mr. Geister says that when he discovered that the object which he saw on the track was a man he stopped the train within about 150 feet, and admits that had

he applied the brakes when he first saw the object he could have stopped the train before reaching the body. His reason for not stopping the train sooner is, that when he first saw the object on the track he did not know it was the body of a human being, and he waited until he was near enough to see that it was the body of a man before attempting to stop. When he made the discovery that it was a man, he was within fifty feet of it and then it was too late to stop before hitting it.

The body of the deceased was lying prostrate on the track, face down, over against the right hand rail, with feet north toward the oncoming train. The track was free from obstruction. The head and the trunk extended about four inches above the rail. The body was motionless before being struck and showed no signs of life whatever after being taken from under the train.

Under the above uncontradicted facts, the defendant sets up two defenses.

First, that the deceased was dead when its train struck the body, and,

Second, in case the court should find and hold that he was not dead, and that its train killed him, then, in the alternative, it is contended that it was not the engineer's duty to stop the train as soon as the object was discovered on the track but, that he had the right to wait until he could with reasonable diligence discover that it was the body of a human being.

Considering these points in the order named.

The defendant alleged that the deceased was suffering from heart disease from which he was likely to die suddenly at any moment, and counsel argue that inasmuch as the body was lying on the track motion-

less at the time··he ·was struck, ·and inasmuch as· it showed no ·signs ·of ·life· after it ·was picked· up; ·the presumption is that it ·was· dead ·when struck.·

There is no proof in the record that the deceased was afflicted with heart disease or any other that would likely cause his death suddenly. On the contrary, it is shown that he was in good health, but was intoxicated when last seen alive.

As stated, the head and trunk of the body extended some four inches above the rail and track and was struck and dragged about sixty feet, one arm being cut off, one leg broken and the face and head bruised. These injuries, together with the shock from being struck and dragged along the track, were sufficient, we think, to produce instant death.

The fact that the deceased was drunk suggests that he either fell on the track and could not get up or that he lay down and went to··sleep. In the absence of any proof that he ·had heart disease, or· any other disease that might bring on sudden death, we cannot assume that he was dead on the track when struck by the train.

On the second point, while it is alleged and shown that the deceased was guilty of the grossest contributory negligence in getting drunk and lying down on the track, it is not denied that if the engineer after seeing the deceased prostrate and helpless on the track could, with due diligence and care, have stopped the train in time to avoid killing him, the defendant is liable under the doctrine of the last clear chance.

McClendon vs. V. S. & P. Ry. Co., 111 La. 785, 35 South. 902.

McGuire vs. V. S. & P. Ry. Co., 46 La. Ann. 1545, 16 South. 457.

Harrison vs. La. W. R. Co., 132 La. 765, 61 South. 784.

Jones· vs. Mackay Tel. Cable Co., 137 La. 121, 68 ·South. 379.

20 R. C. L. 138.

29 Cyc. 530.·

But counsel for defendant contend that—

"It is not the duty of an engineer to stop a passenger train as soon as he sees an object on the track ahead when he does not know what it is and has no reason to believe that it is the body of a man. That duty arises· only when in the exercise of due diligence he discovers that the object is a human body in peril,"

and they cite in support of that theory several authorities, including—

Rogers vs. L. R. & N. Co. 143 La. 58, 78 South. 237.

Tyer vs. G. C. & S. F. R. Co., 143 La. 177, 78 South. 438, by our Supreme Court.

In the Rogers case, the engineer saw a dark object on the track three hundred feet ahead of him but did not suspect that it was a human body until he was within fifty feet of it. The body was motionless just before the engine struck it, when the man slightly moved his head.

The court held that the engineer was not negligent and reversed the judgment of the lower court, but said:

"The place where the accident occurred is about two hundred and four feet east of the crossing of the Alexandria & Western railroad, on the outskirts east of the city of Alexandria. On one side of the track is an open field, on the other side a thicket. There are no human habitations in that neighborhood and there are no public roads near or crossing the railroad track. In other words, it is a place where no one would reasonably expect to find any human being between 10:30 and 11 oclock at night."

The court, further commenting, said: that the testimony showed that it is extremely difficult at night to distinguish objects on the track, and that the distance at which they can be recognized varies with their size, color, motion or lack of motion, weather conditions, etc., and said:

"The place where they are seen may sometimes offer a clue to their identification and at other times mislead the mind as to their real nature."

There is marked similarity in that case and the case at bar in that in each case the engineer saw the object on the track when about 300 feet away and did not discover that it was a human being until wtihin about 50 feet away, when it was too late to avoid the accident, but there is marked dissimilarity in the two, in that in the Rogers case the body was on the track at a place where—

"* * * there are no human habitations in that neighborhood, and there are no public roads near or crossing the railroad track. In other words, it is a place where no one would reasonably expect to find any human being between 10:30 and 11 o'clock at night."

Whereas, in the case at bar, the body of the deceased was on the track between two public crossings on the outskirts of the town of Ruston, where there were numerous human habitations near the track and where the track was commonly used as a pathway by pedestrians.

In the Tyer case, supra, the deceased was lying, face downward, on the track out in the piney woods, a place where no one would suspect the presence of a human body lying upon the track. The engineer first saw a dark object on the track when about 100 feet away but recognized it as a human body when within 60 or 70 feet away, when it was too late to stop the train before reaching it.

The court held that the engineer was not negligent in not discovering the body sooner under these circumstances.

We do not think the two cases cited above are authority for holding that as a broad, general principle of law an engineer in charge of a locomotive is warranted, when he sees an object on the track, in waiting until he is sufficiently near to determine that it is a human body before bringing his train to a stop so as to avoid running over it.

On the contrary, we think the conditions and circumstances surrounding each case must be taken into consideration in determining whether those in charge of the train were negligent.

In the very recent case of Southern Ry. Co. vs. Wahl, decided October 16, 1925, and reported in 149 Southeastern 72, it was stated, in a general way, that it is not the duty of an engineer to stop a passenger train as soon as he sees an object on the track ahead when he does not know what it is and has no reason to believe that it is the body of a man, and that his duty to stop arises only when in the exercise of due diligence he discovers that the object is a human being in peril.

But in that case the plaintiff was lying beside and upon the track with his arm across the rail on defendant's private right of way—

"* * * remote from a crossing, where it was not shown that they had any reason to expect any person to be"
and the court said:

"It is for the jury to consider the conditions and circumstances disclosed by the evidence in determining what action should have been taken or avoided, what precautions should have been taken and what course of conduct should have been pursued in order to measure up to the duty of 'due care' which the law imposes."

In the case of Louisville, Henderson & St. Louis R. R. Co. vs. Hathaway, administrator, decided by the Kentucky Supreme Court and reported in 89 Southwestern 724, (2 L. R. A. N. S. 498) the court held that as to a trespasser lying beside a railroad track the trainmen are not bound to stop the train as soon as the object is seen by them "looks like a man" but they may wait until the fact that it is a man appears.

The facts in that case were, that the injured man was drunk, and was lying outside the track with his head between the ends of two cross ties.

The train was backing, and the conductor and a colored brakemen were keeping a lookout. When about 150 yards away they discovered the man but did not know that it was a human being or what the object was. They watched the object until the train got within four or five car lengths of it, when they discovered that the object was a man. It was then too late to save him. But the court found that—

"* * * as the decedent lay he was in no actual danger from the cars, and had he remained quiet the train would have passed him without injury, but about the time the caboose which, as said before, was the forward end of the train, got within 30 feet of him he spasmodically, it appears, threw his arm across the track and it was crushed by the wheels of the caboose."

In a case note to the above decision, found in 2 L. R. A., N. S. 498, it is stated that the general doctrine laid down in the case of Goodman vs. L. & N. R. R. Co., 116 Ky. 900 (63 L. R. A. 657, 77 Southwestern 174), adopted in the reported case, to the effect that persons in charge of trains are not bound to stop or slow down at the first appearance on the track of an object the nature of which is not known and is only discoverable upon near approach, although such object proves to be a trespasser, is repeated in similar terms in decisions from New York, Arkansas, Missouri, Mississippi, and Virginia, and the note continues:

"It is obvious, however, that even among the cases that present the same general situation, namely: an object discovered on or near the track but not at first recognized as a human being, there will be distinguishing features and circumstances which may affect the soundness or applicability of that general doctrine."

And the annotator reviews the cases and points out some of the circumstances which seem to have been controlling. For instance, in the New York case cited, it is stated:

"Presumably there was nothing in the nature of the locality or other circumstances to put the engineer upon notice that trespassers might be upon the track."

And in the Missouri case:

"The court emphasized the fact that the child was not at or near a public crossing, nor at a place frequented by children, and that the trainmen had no reason, from the locality or circumstances, to suspect the presence of a child upon the track."

In the Kentucky case, the child was lying upon a trestle where it was seen in time for the train to be stopped, but the engineer thought it was a dog or a bundle and did not discover that it was a child until it was too late. The opinion emphasized the fact that the engineer did not entertain any doubt as to the character of the object and was not debating whether the object on the trestle was or was not a human being.

In one of the Virginia cases the engineer discovered what he thought was an inanimate object lying on the track and had no idea that it was a human being.

In another Virginia case the engineer saw what he thought was a shadow or a bush coming from the right of way, and the court emphasized the fact that the engineer entertained no doubt as to the nature of the object, being satisfied that it was a shadow or a bush.

It therefore appears that no court, so far as we are able to ascertain, has laid down the broad proposition that, as a matter of law, persons in charge of a train have the right to wait, after seeing an object on the track, until near enough to discern that the object is a human being, before attempting to stop the train. In all the cases where they have seemed to so hold, including our own court, it will be noted that they have qualified the doctrine by showing conditions and circumstances which exonerated the defendant in the particular case before them.

On the other hand, there is a line of decisions which hold, specifically, that it is the duty of an engineer to stop his train as soon as he sees an object on the track and that he is not warranted in waiting until he is near enough to ascertain that the object is a human being.

In the case of East Tenn. G. R. Co. vs. St. John, 73 Am. Dec. 149, it was held that when those in charge of a train see an object on the track ahead, not knowing what it is, they must stop and not wait until they get close enough to see that the object is a human being in peril.

In the case of Becker vs. Louisville & Nashville R. R. Co., 110 Ky. 474 (53 L. R. A. 270, 61 Southwestern 997) the court said:

"If the engineer becomes aware of anything upon or dangerously near the track which may possibly be a human being or a valuable animal, he is bound to check the speed of his train so as to enable him to stop in time to avoid injury; and if injury ensues from his negligence to do this, his sincere belief that the object was worthless is not a defense."

This broad, general doctrine, however, seems to have been overruled in some jurisdictions as is indicated by the decisions above referred to.

In the case of Hyde vs. Union Pacific Ry. Co., 7 Utah 356 (26 Pac. 979) the court stated that when the servants of a railroad company saw an object on the track at a place frequented by children and failed to slacken the speed so as to be able to stop before striking the child they were guilty of negligence.

In the case at bar, the deceased was killed in the south part of the town of Ruston which has a population of about 5,000, between two street crossings, one known as South Line street crossing and the other to the south of it known as Price's crossing. Price street is something over 500 feet south of South Line street and is probably not kept up by the city and is but little used except when it is dry. On or near this street, however, there is a considerable settlement known as Tolbert's quarters and Price's quarters. and we infer from the testimony that a great many families, probably twenty-five or thirty, live in or near this street. There are also dwellings near the right of way between these crossings. The people who live down there, or a great many of them, in going north to the main portion of the town use the railroad track as a footpath in wet weather (the deceased was killed on a rainy night). One witness estimated that from twenty-five to seventy-five persons walk the track each day where the deceased was killed, and another estimated that from forty to fifty each day used that track as a footpath.

Mr. Thigpen, the sheriff, said that:

"On the east side of the track from this South Line street crossing on down, there is darkies and there is white people living something like two hundred yards. On the other side something like three or four hundred yards it is pretty thickly settled."

He said that the greater portion of those living on the west side use another route going to town but that those living on the east side use the track.

The testimony shows that just opposite the right of way where the deceased was run over there is a small mercantile establishment where people congregate at the South Line street crossing.

Counsel for defendant argue that whereas the track north of South Line street crossing is much used by pedestrians yet that south of that street is not used. But the testimony does not sustain them on that point. It is true that the track is used more north of that crossing than south of it, but the testimony shows that the track at the point where the deceased was run over is much frequented by pedestrians. There was no warning sign there against the use of the track.

Under the conditions and circumstances shown to have existed in this case, it was the duty of the engineer to take extra precaution to avoid injury to those who might be upon the track. It was not an isolated place where no one was expected to be found on the track. The precautions to be adopted and the steps to be taken in aid of safety increase as the danger of accident and injury increases.

Ortlano vs. M. L. & T. R. R. & S. S. Co., 109 La. 902, 33 South. 914.

Eichern vs. N. O. & C. R. L. & P. Co., 112 La. 237, 36 South. 335.

Williams vs. Mo. Pac. R. R. Co., 155 La. 354, 99 South. 286.

Even if it be conceded that under some conditions and circumstances those in charge of a train who see an object on the track may wait until they are close enough to see that it is a human being before stopping, it cannot be said that such rule prevails in cities and towns where the track is constantly used by pedestrians.

It must be borne in mind that the engineer did not state that he was mistaken as to what the object on the track was. He said that he did not know what it was. He took chances. He had no right to take such chances at that point. We think he was guilty of the grossest kind of negligence and unquestionably had the last clear chance to avoid the accident, and the defendant is therefore liable.

## ON THE QUANTUM OF DAMAGES

The District Court awarded $4,000.00 to the widow and $4,000.00 to the two minors. The deceased was 39 years old and in good health but addicted to strong drink to some extent. Some effort was made to show that he was shiftless and that his father supported him and his family; but the father testified that his son supported not only his own family but also him and his wife. He was a farmer and made but little some years, but it seems that when crops were poor he did hauling—at any rate he took care of the family. We do not think we would be warranted in disturbing the award made by the lower court.

For the reasons assigned, it is therefore ordered, adjudged and decreed that the judgment appealed from be affirmed with costs.