## CARLINO v. NEW ORLEANS PUBLIC SERVICE INC.

---

(March 12, 1928.	Opinion and Decree.)

---

(*Syllabus by the Court*)

1. Louisiana Digest—Automobiles—Par. 4 (a); Street and Interurban Railroads —Par. 31, 34; Evidence—Par. 351.

A judgment based on a jury's verdict in favor of a guest in an automobile for seven hundred fifty dollars will be reversed where the preponderance of the evidence fails to show that the motorman of the car was negligent under the circumstances.

Appeal from Civil District Court, Division "C." Hon. E. K. Skinner, Judge.

Action by Thomas Carlino against New Orleans Public Service Inc.

There was judgment for plaintiff and the defendant appealed.

Judgment reversed.

S. Roccaporte & D. Wendling, of New Orleans, attorneys for plaintiff, appellee.

B. W. Kernan, of New Orleans, attorney for defendant, appellant.

JONES, J. Defendant appeals from a judgment for seven hundred fifty ($750.00) dollars, based upon the verdict of a jury, by a 9 to 3 vote.

Plaintiff sued for twenty-two thousand, six hundred and sixty-five ($22,665.00) dollars damages for personal injuries sustained August 23, 1924, in a collision between the automobile in which he was riding as a guest of the driver and a Laurel street car, at the corner of Annunciation and Sixth Streets.

Plaintiff avers (about ten o'clock at night) the automobile was going in Sixth Street from the river and the electric car was going up Annunciation Street toward Audubon Park; plaintiff's left leg was broken and permanently shortened and he claims the following damages:

| | |
|---|---|
| For the permanent shortening of his leg | $13,000.00 |
| For the impairment of his constitution and weakening of his nervous system | 2,000.00 |
| For pain and suffering endured | 7,000.00 |
| For loss of wages | 665.00 |
| | $22,665.00 |

The negligence of defendant is set forth as follows:

1st. That defendant had torn up the street between the rails of its track in the course of certain construction work at or near Annunciation and Sixth Streets, and had piled material and dirt at the corner in such way as to leave a passageway over Annunciation wide enough for only one automobile to cross at a time, the piles of material and dirt being sufficiently high to obstruct the view of an automobile driver coming from the river and prevent his seeing vehicles approaching Sixth Street from the Canal Street side.

2nd. That, disregarding a sign to go slow, the motorman ran the car over Sixth Street at a speed in excess of thirty miles an hour.

3rd. That the motorman gave no signal when approaching Sixth Street.

4th. That the brakes of the car were defective.

Defendant denied the allegations of damage and of fault, and averred that the cause of the collision was the negligent operation of the automobile in which plaintiff was riding; defendant also charged that plaintiff was himself negligent, and, therefore, was himself responsible for the injuries he received in that he did not warn the driver of the automobile of the danger of crossing the tracks in violation of the city ordinance, and in that he had his leg extended beyond the body of the automobile.

We briefly summarize the testimony of the various witnesses:

J. H. Graham, on behalf of plaintiff, driver of the old Ford touring car, Model 1921 or 1923, which was owned by Sydney Casserino, said that he was driving in Sixth Street toward river, stopped with front wheels on first rail, heard someone shouting, looked for car, saw it about fifty feet distant, coming at twenty-five miles per hour, didn't back off but tried to beat the car across when auto was struck at rear end and thrown against post at upper lake corner. Car, which was crossing track about ten miles per hour, stopped with rear end at property line, uptown side Sixth Street. Could not see down Annunciation before getting on rail because of the piles of dirt and a shed, dirt pile five feet high, shed eight feet from ground. Eyes of driver of auto about five feet from ground. Annunciation Street is about twenty-five feet wide; about eight feet from curb to first rail of track; from driver's seat to front of radiator is about four and one-half feet, one length of cross ties had been placed between the rails, even with the tracks, so as to form a level crossing.

Albert Hoffman, a friend of the owner of the automobile, said that he was standing under the shed at the corner of Sixth and Annunciation Streets, saw the automobile come and check speed for the crossing, and that when they saw the car it was on top of them, but they tried to "make it over." Dirt was piled about five feet high; motorman did not give any signal. He and friend were walking along downtown side of Sixth Street and were waiting for the automobile to cross Annunciation Street so that they could go on to Magazine Street. When they started to cross the automobile was near Chippewa Street and when they were ready to cross the automobile was near Annunciation Street. The driver of the automobile brought the car to a stop two feet from the car track and then went ahead; he did not see the street car until the moment of collision. He could see the top

of the street car over the mud piles; the car was lighted.

Max Fiegler, friend of Hoffman and of the owner of the automobile, said that he was talking with Albert Hoffman under the shed at Annunciation and Sixth Streets. He saw the automobile coming out Sixth Street, it stopped for the crossing and went over; it was not going fast. There was some dirt piled in the street on the riverside of the car track, the piles were about four or five feet high. He and Hoffman did not stop under the shed any appreciable time; the street car was coming up Annunciation Street and the automobile coming out Sixth Street. As they started across Annunciation, the street car was at Washington Avenue. Had no difficulty in seeing the street car over the piles of mud. The car was coming at a speed of twenty to twenty-five miles an hour. When he saw the car at Washington Avenue the automobile was about a half block from Annunciation Street coming about ten miles an hour. When the auto was about eighteen feet from Annunciation Street he blew his horn; he stopped the automobile eighteen feet from Annunciation Street, blew the horn and went on, went over the car track at ten to twelve miles an hour; the automobile had not reached the corner when the street car was about at the lower side of Sixth Street, and he saw there was bound to be an accident. The automobile was hit in the side in the back where the door opens. The car stopped, partly blocking Sixth Street. When the automobile was crossing Annunciation Street the car was moving about fifteen miles an hour.

Eug. Lapouble, District Superintendent in Department of Public Works, said he was walking along the lower side of Sixth Street toward Annunciation Street. The automobile passed him at the lake corner of Chippewa Street and he had reached about one hundred feet when he heard the noise of the collision. There was a fourteen-foot (or the length of two cross-ties) bridge over the open track work at Annunciation and Sixth Streets.

Harold Raymond, a friend of Carlino, said he was on the right side of the rear seat of the automobile, with Carlino on the left side of the seat. They were travelling out Sixth Street and when they reached Annunciation the driver brought the automobile practically to a stop and then crossed at about five miles per hour; as he was crossing the tracks the street car struck the automobile; the car was running fifteen to eighteen miles an hour. He did not see the street car until it was practically on top of the automobile; when stopped, the rear end of the car was ten feet past the upper side of Sixth Street.

The automobile was crossing the tracks at two to three miles an hour; it had been brought to that speed when about four feet from the track; at that speed it can be stopped in a foot.

Sidney Casserino, the owner of the automobile, said that he was seated with the driver on the right hand side. When he reached the corner of Annunciation they stopped. The driver could not see the street car because of the dirt piled in the street on the riverside of the car track. Not seeing the street car the driver of the automobile proceeded across the tracks and, as the front wheels were on the track, the driver saw the car which was then about five to ten feet from him. No signal was given by the motorman. The car struck the automobile and knocked it against a lamp post at the uptown lake

corner of the crossing. The car stopped with its rear end about five feet beyond the property line on the upper side of Sixth Street. Does not know whether the driver of the automobile looked toward Washington Avenue before going over the tracks. The front wheels of the automobile would have to be on the first rail of the track before one could see a car coming. The automobile was stopped with its front wheels on the wooden foot bridge on river side of Annunciation Street, and then proceeded over after sounding the horn. The automobile was struck on the side. The shed at downtown river corner of Sixth and Annunciation Streets is about eight feet high at curb of sidewalk; the head of the driver of the automobile was about a foot higher than the pile of dirt, could see down Annunciation Street about twenty-five feet, the shed and the pile of dirt would prevent him · seeing a greater distance down the track. A Ford traveling at five miles an hour can be stopped in about two or three feet.

Thomas Carlino, plaintiff, said that he got into the automobile at Chippewa and Sixth Streets; the automobile was traveling between twelve and fifteen miles an hour until it reached the dance hall in middle of block between Chippewa and Annunciation Streets and from there to Annunciation Street the speed was about three miles per hour. The automobile was stopped on the bridge where people walk (over Sixth Street along river side of Annunciation Street); the horn was sounded and the automobile was started across the street. He did not see the car coming because the man seated next to him was taller than he. Automobile was on track, when he saw car about five feet from the automobile. Because of the crossing the automobile could not go fast. His legs were inside the automobile. The collision caused his knee to hit the back of the front seat and twist his leg so that it broke. The motorman did not sound the gong. When the automobile stopped on the bridge the driver's seat would be about six feet from the track, even with the sidewalk. The mud and the shed would prevent the driver of the automobile seeing a street car coming up Annunciation Street. The driver's head would be about four or five feet from the ground; the shed was about eight feet high at the sidewalk curb. He does not know if the driver looked to see if a car was coming; he looked, but could not see any car; he could see half a block down Annunciation Street.

Marzloff, who was standing on front platform, says car stopped at Washington Avenue to let off a passenger, motorman rang his bell about fifty feet from Sixth Street and was slowing down to let off passenger at upper side of Sixth Street, when auto, going at moderate speed, ran in front of street car without stopping or looking, auto was struck on side at right rear end and knocked up against post on upper wood side of Sixth Street, car stopped so that its rear end was about middle of Sixth Street, heard no auto horn, thought it was on car track when he first saw it.

Track was in good condition, car, which was crowded, was going at moderate speed, "motorman had his juice thrown off and was working his air brake when auto loomed up," was looking ahead, motorman rang his bell to warn people on corner, who were running toward gutter and "hollering;" auto was not more than six feet from car at the most, when he first saw it. After the accident driveway was blocked by the street car, and fender of car damaged. Immediately after the accident, auto could not go out Sixth Street, because rear end of street car was block-

ing driveway. Saw a passenger, Mr. Lehmann, in the car, knew where he lived and thought that he would get off at Sixth Street and when he heard the bell ring to stop at Sixth Street took it for granted he would get off. "It was impossible for motorman to stop quick enough to avoid hitting the auto."

Panquerne, shoe salesman, who was on rear platform of car with Oyster, speaking to conductor, says car was not crowded, car, which had stopped at Washington Avenue, had a passenger to get off at Sixth Street; thinks car was going eight or ten miles per hour. Rear end of car, when he heard crash, was on lower side of Sixth Street, and after the accident rear end of car was blocking Sixth Street with front end six or eight feet past the corner and auto up against telegraph pole, particularly heard gong ringing near Sixth Street, because streets were torn up, traffic is heavy over Sixth Street all the time; a passenger was about to unboard the car at Sixth Street; car, which was making a little noise, did not hit auto a very violent blow, top of auto was all broken and back wheel.

Englebracht, wood turner for New Orleans Furniture Co. for twenty years, was passenger on car occupying third seat from front on left side; when car was slacking up to stop at Sixth Street to let passengers off because of reconstruction of track, saw auto just about a fraction of a second before impact about thirty feet from car, coming at a pretty fast speed, front end of car after accident was eight or ten feet beyond gutter at upper corner and back end was below lower sidewalk, just enough for an auto to go down Sixth Street, but it could not pass to go around; positive he heard motorman ring his gong; looked out of the window oppo-site his seat after accident, and auto was along side, about a foot in rear; doesn't think it was the hit of the car that knocked the auto to the post, but the speed of the automobile; trolley may have been off as lights were out; mud was thrown on uptown side of Annunciation Street; front part of street car was just about downtown gutter of Sixth Street when he first saw auto, which was going at a pretty fast clip, impossible for car to stop, did not hear auto horn, but positive heard gong near the corner; was an ex-conductor and knew by the momentum of car that it was going to stop; doesn't recall hearing gong at Washintgon Avenue, but positive he heard it near Sixth Street; there was a red light on upper river side of Sixth Street.

King, mechanic, was in front of dance hall on downtown side of Sixth Street between Chippewa and Annunciation, saw auto pass, going very fast; went at once to scene of accident and found auto against post and back of street car in middle of Sixth Street; only saw one auto pass.

Gus Lehrmann, laborer, lives at 619 Sixth Street, was passenger, after car had passed Washington Avenue fifty or one hundred feet, rang bell, went back and stood on rear step to get off at Sixth Street; got off car, which was blocking Sixth Street, after it came to a stop, about two or three feet past lower bridge on Sixth Street; they were repairing track between Washington Avenue and Sixth Street or Sixth and Seventh Streets, not certain; "motorman sounded gong and slackened speed to let me off." There was no car behind this one; a gentleman got on at Washington Avenue; doesn't know whether gong sounded at Second, Fourth or Washington, as he wasn't paying attention, but certain it sounded at Sixth Street, because he was on step; is fifty-nine years old and

has been riding on cars a long time; saw auto against post; there was light on corner, but didn't notice trolley; heard one man holler; if blow had been hard, he would have been knocked off step; post, on uptown lake corner, against which auto struck, was not twenty feet from middle of intersection; no auto could pass after accident as Sixth Street was blocked by car; front end was ten feet beyond upper sidewalk curb of Sixth Street when car stopped.

Assenheimer, employee of Lukens Steel Company, was standing in front end of car, between the doors facing uptown, first saw auto going about twenty-five or thirty miles per hour on river side of crossing of Sixth Street where people walk, when street car was about ten feet from lower side of Sixth Street, rear part of auto about a foot in front of back wheel was hit by headlight of car; Sixth Street was blocked by the car. Car was coming to a stop at Sixth Street; motorman sounded his gong about twenty-five feet from corner; saw Marzloff on front platform, but did not speak to him; lights on car went out after it hit the auto until trolley was put back on; he has driven a car about eight years; Sixth Street was in good condition, but car track was torn up in intersection; didn't hear auto horn, although it was only fifteen feet from track, when he first saw it. Car had stopped at Washington Avenue; they were digging up the tracks on uptown side of Sixth Street and there was a pile of mud about a foot high on the lower river side of Sixth Street; gave his name voluntarily to conductor; there was a red light on the uptown side of Sixth Street; didn't notice "Go Slow" sign between Washington Avenue and Sixth Street.

Seron, night clerk for Consumers Bis-

cuit Company for four years, was standing on front platform on right side of motorman, saw auto approaching fast about ten feet from car track as car coming to a stop approached Sixth Street, after accident part of car was in Sixth Street and greater part in next block; gave name to motorman or conductor; motorman gave regular gong signal about twenty-five feet from corner, after he got bell to stop; jumped back, turned his head when he saw accident was about to happen; there was certainly one other person on front platform, but he didn't pay any attention to him; didn't see Assenheimer in the front end of car; saw motorman apply brakes about ten feet from curbing on Sixth Street; couldn't say how fast car was going. Motorman fed his car up to seven or eight points; used to be a conductor, but was discharged for shortage on register; auto was knocked against lamp post, didn't notice condition of track; automobile couldn't pass in Sixth Street after the accident because car was in the way; motorman apparently had no trouble with his brakes; motorman after seeing auto put on his brakes and stopped before he reached uptown corner of Sixth Street, where he intended to stop.

Spansel, New Orleans motorman since January 11, 1926, in citizen clothes on front end of car, right hand side, saw auto about five feet from river side sidewalk line of Annunciation Street coming at a fast speed about twenty miles per hour; when front end of car was about ten feet from lower footwalk on Sixth Street, motorman, who had heard the bell, was bringing his car to a stop at Sixth Street; auto driver, when he saw street car so near, tried to beat it across; right hind wheel of auto was struck and trolley of car was knocked off; after accident second window of car from front was on upper foot crossing of

Sixth Street; helped raise car fender, which was badly bent; heard motorman sound his gong about twenty or thirty feet from lower Sixth Street; two or three passengers were on front platform; car was crowded, another car pulled up behind the car about ten or eleven minutes after accident. About twenty feet from the lower side of Sixth Street car was going about ten miles per hour and the car could stop in sixty to seventy-five feet. There was a sign "Go Slow" stuck up in the mud on the river side of Annunciation Street, facing the way you come up. After accident auto was facing downtown.

Conductor Auster, in citizen clothes, was on rear platform talking to Panquerne and the conductor of the car that struck the automobile, when he wasn't busy; car stopped at Washington Avenue, a passenger got up and walked back about middle of block; conductor gave a signal to stop at Sixth Street; the motorman threw off his power and just as car reached middle of Sixth Street, he heard a crash; got out and saw auto up against post; second window of car from front was about opposite uptown crossing of Sixth Street and rear end of the long car about six or seven feet from lower crossing of Sixth Street, which was completely blocked for automobile usage by the street car; that is a dangerous street and he paid particular attention to the motorman ringing his gong. "I have been on the cars a length of time and I can pretty well tell when the motorman has thrown off his power and is coasting." There are vehicles coming in and out Sixth Street at all times and for that reason car is supposed to be under control; made an examination after he got names of witnesses and cross ties were even with rails; car coasting eight to ten miles an hour when it got to lower side of Sixth Street, preparing to stop. These

cars, going at that speed, can stop in sixty or seventy-five feet; at the time of the impact, car was going five miles per hour, trolley did not go off and lights did not go out.

Wingerter, conductor since March 1, 1921, was in charge of the colliding street car, swears car stopped at Washington Avenue, doesn't know whether motorman sounded his gong, heard crash about time front end of car reached center of Sixth Street; trolley flew off and he found auto up against post at corner on uptown wood side of Sixth Street, rear end of car was in center of Sixth Street, passenger signalled and he gave motorman bell to stop and he began to check his car about a quarter of a block from Sixth Street and it was going about ten miles an hour as it reached lower side of Sixth Street. The motorman was an extra man and that was the first day he worked with him.

Chatelain, motorman of colliding car, comes from Marksville and speaks French chiefly, at time of trial was employed by Bancroft Steel Co., worked for street car company eight or nine months and doesn't remember how long he had been motorman before this accident, but he was then an "extra" motorman, that is one who takes place of a regular employee when he is absent; car had stopped at Washington and he had received signal to stop at Sixth Street about two hundred feet from corner, had cut off power and put on his brake to stop when he got about ten feet from Sixth Street saw auto coming pretty fast, about twenty or twenty-five miles per hour; about twelve or fifteen feet from track, he then put on his brake as hard as he could. "The auto made a little curve like to protect the accident and his front wheel hit the fender of the car and the auto hit the post;" car rolled a few

feet after accident and stopped with front end about ten feet over Sixth Street and back end not quite in middle of Sixth Street; couldn't possibly have stopped sooner after he saw the automobile; had been a jitney driver in Marksville before he came to the city and had been working on that line just one day, but doesn't remember how long he had been employed as a motorman. Two or three people were on platform, but not talking to him. "I believe I was five or six minutes late, I am not sure." Didn't have shades down, but could read all the rules of the company in English and had operated many cars; can stop a car going ten miles per hour in sixty to ninety feet; was discharged about two or three months after this accident, was hitting his gong as he approached Sixth Street.

Cummings, track foreman for defendant for fourteen years, who was reconstructing track on Annunciation Street between Washington Avenue and Ninth Street, says his force stopped work at five-thirty and he stayed around a while to see that all was o. k., identifies the plan in the record as about correct, had finished and closed the track work within twenty-five feet of Sixth Street; had made a roadway of two lengths of ties placed end to end sixteen feet wide in Sixth Street; there was a small dirt pile on the uptown river side of Annunciation Street and a larger one, not more than four and one-half feet high, about seven feet wide at base on the downtown side of the same street, both in Sixth Street; there was a red light on both dirt piles, one on the foot crossing and one on the traffic cross, ties were level with the rails, shed on lower river corner of Sixth and Annunciation Streets was about twelve feet high and there were a dozen lights between Sixth and Seventh Streets; watchman Ralston was on the job that night and he would have reported if lights were not burning.

Cronan, claim agent of defendant, went to scene of accident the next day, Sunday morning, and made measurements, sidewalk on Sixth Street is ten feet, that on river side of Annunciation is eight and one-half feet, distance from that sidewalk to river rail is ten and one-half feet, gauge of rail five and one-quarter feet, and distance from lake rail to lake sidewalk ten and one-half feet, and width of lake sidewalk on Annunciation Street is eight feet, two inches, width of roadway on Sixth Street is twenty-nine feet, five inches; and width of sidewalk on lower side of Sixth Street is ten feet, two inches and on upper side eight feet, two inches; shed fronts thirty feet on Annunciation and eighteen feet on Sixth Street; his were in middle of Sixth Street; pile of mud on lower side of Sixth Street was about three feet. As he approached Annunciation from river on Sixth Street, just before he got to the foot crossing, he looked under the shed and could see down to Fourth Street; didn't measure exact locations of mud piles, just estimated; lower part of shed was about ten feet high, supported by posts; plan in record was copied from a pencil drawing made by him.

Woodruff, employee of defendant, states length of those cars is forty-seven feet, eight inches and weigh eighteen tons.

Although the track was undergoing reconstruction, the passageway over the rails was sufficient for automobile use. The piles of dirt relied upon by plaintiff as showing fault did not cause the accident, for it is established by the evidence that the pile of dirt was not high enough to obstruct the chauffeur's view of the oncoming accident.

The charge that the speed of the car

was in excess of that allowed by law and negligent is not established, for the preponderance of the evidence is to the effect that the car was being brought to a stop at Sixth Street to discharge a passenger and was, in fact, stopped before reaching the regular stopping place, so as to block Sixth Street for automobiles. Had the car been travelling at thirty miles an hour the car could not have been stopped so quickly.

The charge that no warning was given of the approach of the car is not established, for the preponderance of the evidence shows that the gong was sounded.

Nor is the charge that the brakes were in bad condition proved, for the only evidence on the subject is that they were in good order.

The above digest of the evidence shows clearly that the driver of the auto was negligent as he frankly admits that he drove upon the track without stopping.

The sole question before this Court is whether the motorman had the last clear chance to avoid the accident, for the negligence of the chauffeur cannot be attributed to the guest.

See Peterson vs. Railway Co., 142 La. 835, 77 So. 647.

The law applicable is stated by the Supreme Court in the case of Ortolano vs. Railroad, 109 La. 902, in these words:

"The precautions to be adopted and the steps to be taken in the aid of safety increase as the danger of accidents and injury is increased."

The fact that the auto was turned around and thrown against the post near the uptown lake corner of Sixth and Annunciation Streets is explained when we consider that the width of Sixth Street from curb to curb is only twenty-nine feet, five inches and the width of Annunciation from curb to curb is only twenty-six feet, three inches as shown by the record. The resultant effect of the combined force when the Ford car going at least ten miles per hour was struck on right rear wheel by the heavy street car weighing eighteen tons, though going slowly, would naturally swing the rear of the auto violently around in the direction it was going.

We are convinced that the plaintiff has failed to prove that the motorman was negligent under all the circumstances and the judgment will be reversed.

The following words of the Supreme Court in McGinn vs. N. O. Railway & Light Co., 118 La. 822, 43 So. 450, are pertinent here:

"The actual cause set up has been negatived by the testimony. Were the facts such as plaintiff's counsel claims them to have been, the jury should have accorded plaintiff a larger amount than it did. The verdict was evidently a sympathetic one. Juries cannot be sustained in indulging sympathy on insufficient evidence at the expense of other persons."

For above reasons the judgment is reversed and the suit is now dismissed.